UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
ALEC SOYBEL, GALINA KAMINKER, BORIS SHAPIRO, SAVAS TSITIRIDIS, GUY ROBERTS, STEVEN NEWMAN, and ROD NEWMAN, on Behalf of Themselves and Others Similarly Situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK, NEW YORK CITY TAXI & LIMOUSINE COMMISSION, MATTHEW W. DAUS, DAVID YASSKY, MEERA JOSHI, ALLAN FROMBERG, CHARLES FRASER, MICHAEL BLOOMBERG, EVGENY FREIDMAN, VLADIMIR BASIN, AND MAMED DZHANIYEV,

Defendants.
---------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
21-cv-1846 (CBA) (MMH)

**AMON, United States District Judge:**

This proposed class action alleges a fraudulent scheme by the City of New York—acting by and through its agency, the New York City Taxi and Limousine Commission, and through the coordination of various public and private individuals—to artificially inflate the value of New York City taxi medallions to the financial benefit of the City, and, upon the market's collapse, to the financial detriment of Plaintiffs, owners of taxi medallions. Plaintiffs allege that from 2004 and continuing to at least 2017, Defendants conducted a scheme consisting of the following five key components: (1) setting falsely inflated minimum sales prices for medallions, beginning at medallion auctions in 2004; (2) permitting collusive bidding at such auctions in 2004 and 2006, thereby establishing an artificial "floor" price for medallion transactions going forward; (3) deliberately concealing an internal report from 2010 which opined that medallion prices had

"outstripped their values"; (4) publishing deliberately false and misleading reports on the average monthly sales price of medallions in the leadup to the 2013-2014 auctions; and (5) launching a false and misleading advertising campaign in advance of the earlier auctions in 2004. (See ECF Docket Entry ("D.E.") # 44 ("Am. Compl.") ¶ 10.) Plaintiffs assert four claims for relief: (1) violation of 18 U.S.C. § 1962(c) (Civil RICO); (2) violation of 18 U.S.C. § 1962(d) (RICO Conspiracy); (3) violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; and (4) unjust enrichment under New York law. (Id. ¶¶ 623-700.)

The City Defendants, as defined below, have moved to dismiss all claims. (D.E. # 53.) They raise the following grounds for dismissal: (1) Plaintiffs lack standing; (2) Plaintiffs' claims are barred by the respective statutes of limitations; (3) Plaintiffs' RICO claims are barred against municipalities and municipal officers in their official capacities, and Plaintiffs have failed to state a civil RICO or RICO conspiracy claim; (4) Plaintiffs' antitrust claim is barred by the Local Government Antitrust Act ("LGAA"), and Plaintiffs have failed to state an antitrust claim; (5) Plaintiffs have failed to state an unjust enrichment claim; (6) the Individual City Defendants (defined below) are entitled to absolute immunity; and (7) to the extent Plaintiffs' claims are based on the payment of medallion transfer taxes to the City, they are barred by the Tax Injunction Act ("TIA") and related comity doctrine. (See D.E. # 55 ("Defs. Mem."); see also D.E. # 58 ("Defs. Reply").) Because, for the reasons discussed herein, I find persuasive and dispositive the City Defendants' argument that Plaintiffs' claims are untimely under the applicable statutes of limitations, I decline to address the City Defendants' other grounds for dismissal.

## BACKGROUND

The below facts are drawn from Plaintiffs' Amended Complaint. For purposes of a motion to dismiss, I accept as true all material factual allegations in the complaint and draw all reasonable

inferences in the plaintiffs' favor. Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013). However, I need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addition, I may consider "'documents attached to the complaint as an exhibit or incorporated in it by reference' so long as 'a plaintiff relied on the terms and effect of a document in drafting the complaint.'" Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 530 F. Supp. 3d 447, 451 (S.D.N.Y. 2021) (alterations omitted) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

## I. The Parties

The seven named Plaintiffs have brought this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23, in their representative capacity on behalf of themselves and the following proposed class of all persons similarly situated (the "Class"): "All medallion owners, including the Plaintiffs in this action, who decided to buy, sell, hold or take out a loan against New York City taxicab medallions based on the artificially inflated market value for such medallions during the period between 2004 and 2017 ('Class Period'), and who suffered financial losses as a result."[1] (Am. Compl. ¶ 303.)

The seven named Plaintiffs are all owners of corporations that own New York City taxi medallions. (See generally id. ¶¶ 317-519.) Many of the medallions that Plaintiffs purchased are what are known as corporate "mini-fleet" medallions. (Id.) A mini-fleet medallion consists of two individual medallions, and under the Rules of the City of New York, mini-fleet medallions are required to be owned by corporate entities rather than individuals. (See id. ¶ 348 n.8 (citing N.Y.C., N.Y., Rules, Tit. 35, § 51-03).) For each named Plaintiff, the Amended Complaint alleges

[1] Plaintiffs allow that the Class may be further defined by various subclasses. (See Am. Compl. ¶ 304.)

the names of the corporations through which they each purchased their medallions. (See generally id. ¶¶ 317-519.) In addition, the Amended Complaint also alleges how each named Plaintiff came to own their respective medallions:

- Plaintiff Alec Soybel ("Soybel") bid in the April 2004 taxi medallion auction but failed to win a medallion. Soon after, Soybel purchased one mini-fleet medallion through a taxi agent, Defendant Evgeny Freidman. (See id. ¶¶ 317-46.)
- Plaintiff Galina Kaminker ("Kaminker") and her sister first purchased a mini-fleet medallion in 1992. In 2014, Kaminker considered selling her medallion but decided not to. (See id. ¶¶ 347-71.)
- Plaintiff Boris Shapiro ("Shapiro") purchased at least six medallions during the Class Period, including some on the open market and some at a 2014 auction. (See id. ¶¶ 372-96.)
- Plaintiff Savas Tsitiridis ("Tsitiridis") purchased well over 20 medallions during the Class Period, including some on the open market and some at the 2004, 2006, and 2013 auctions. (See id. ¶¶ 397-428.)
- Plaintiff Guy Roberts ("Roberts") first purchased taxi medallions in the 1970s. Roberts purchased approximately 30 additional medallions during the Class Period, including in 2004, 2006, 2010, 2013, and 2014.[2] (See id. ¶¶ 429-66.)

[2] Plaintiffs specifically allege that Roberts purchased a number of his medallions on the secondary market, but do not specify whether his purchases in 2013 and 2014 were made at auctions or on the secondary market. (See Am. Compl. ¶ 444.) In their opposition, Plaintiffs indicate these were auction purchases. (D.E. # 56 ("Pls. Opp'n") at 30 (arguing Plaintiffs Shapiro, Tsitiridis, and Roberts "have alleged that they were defrauded when they purchased medallions at the 2013 and 2014 auctions").)

- Plaintiff Steven Newman purchased approximately 14 medallions during the Class Period, including at the 2004 auction and on the open market. (See id. ¶¶ 467-93.)
- Plaintiff Rod Newman purchased a total of approximately six medallions during the Class Period, including at the 2004 auction and on the open market. (See id. ¶¶ 494-519.)

Defendants are various private individuals, public officials, and municipal corporations. The two municipal corporations named as Defendants are:

- Defendant City of New York (the "City"), a municipal corporation in the state of New York. (Id. ¶ 67.)
- Defendant New York City Taxi & Limousine Commission (the "TLC"), a municipal corporation organized in the state of New York and an administrative agency for the City of New York. (Id. ¶¶ 68-69.)

The Amended Complaint names six public officials as Defendants (the "Individual City Defendants," and together with the City and TLC, the "City Defendants"):

- Defendant Matthew W. Daus, Esq. ("Daus") was the Chair and Chief Executive Officer of the TLC and is alleged as being responsible for the challenged actions from 2001-2010. (Id. ¶ 70.)
- Defendant David Yassky ("Yassky") was the Chair and Chief Executive Officer of the TLC and is alleged as being responsible for the challenged actions from 2010-2014. (Id. ¶ 71.)

- Defendant Meera Joshi ("Joshi") was the Chair and Chief Executive Officer of the TLC and is alleged as being responsible for the challenged actions from 2014-2019. (Id. ¶ 72.)
- Defendant Allan Fromberg ("Fromberg") was the Deputy Commissioner for Public Affairs of the TLC and is alleged as being responsible for creating, managing, and supervising all aspects of the TLC's public relations and advertising campaigns. (Id. ¶ 73.)
- Defendant Charles Fraser ("Fraser") was the Deputy Commissioner for Legal Affairs and General Counsel for the TLC and is alleged as being responsible for creating, managing, and supervising the TLC medallion auctions. (Id. ¶ 74.)
- Defendant Michael Bloomberg ("Bloomberg") was the Mayor of the City of New York and is alleged as being responsible for the challenged actions from 2004-2014. (Id. ¶ 75.)

The Amended Complaint also names three private individuals as Defendants (the "Freidman Defendants"):

- Defendant Evgeny Freidman ("Freidman") was an owner of approximately 900 taxi medallions and a broker who sold and/or leased such medallions to third parties. Freidman is alleged to have been a leader of the collusion and price-fixing scheme at multiple medallion auctions between April 2004 and June 2006.[3] (Id. ¶ 76.)

---

[3] Freidman passed away on October 24, 2021. (See D.E. # 51 at 2.) Plaintiffs moved for default judgment against him, which I denied, (id.), and they have not filed a motion to substitute a proper party pursuant to Federal Rule of Civil Procedure 25(a).

- Defendant Vladimir Basin ("Basin") was the owner of a large number of taxi medallions, and a licensed broker who sold and/or leased such medallions to third parties. Basin was a friend, acquaintance, and colleague of Freidman alleged to have been a central participant in the collusion and price-fixing scheme at the 2004 and 2006 auctions. (Id. ¶¶ 78-79.)
- Defendant Mamed Dzhaniyev ("Dzhaniyev") was an owner of a large number of taxi medallions, and a broker who sold and/or leased such medallions to third parties. Dzhaniyev was a friend, acquaintance, and colleague of Freidman alleged to have been a central participant in the collusion and price-fixing scheme at the 2004 and 2006 auctions. (Id. ¶ 81.)

On November 10, 2021, the Freidman Defendants filed an Answer. (D.E. # 48). On March 11, 2022, the City Defendants moved to dismiss, which is the motion now under consideration. (D.E. # 53.)

## II. Factual Allegations

The crux of Plaintiffs' allegations is that the Defendants prioritized their common goal of generating revenue to bring in more than $855 million for the City between 2004 and 2014.[4] Defendants accomplished this by way of a fraudulent scheme that falsely propped up the taxi

[4] Plaintiffs define the Class Period as lasting through 2017, but the acts alleged as part of the fraudulent scheme all occurred between 2004 and 2014. (See, e.g., Am. Compl. at 51 (Section titled "Defendants' Fraudulent Scheme and False Advertising Result in a Meteoric Rise in Medallion Prices from 2004 to 2014"), ¶ 55 (alleging the City's "greed and evil motives were rewarded handsomely" by generating "more than $855 million in revenue . . . between 2004 and 2014"), ¶ 547 (detailing acts of the alleged RICO enterprise as taking place "from at least 2004 up through 2014").) Plaintiffs' extension of the Class Period through 2017 appears to be based solely on the fact that the City continued to collect a five percent transfer tax from medallion transfers on the secondary market until sometime that year. (See id. ¶ 547.) But Plaintiffs do not challenge the legitimacy of this tax nor argue that its collection somehow constituted an overt act in furtherance of the RICO or antitrust scheme, or their unjust enrichment claim. Indeed, Plaintiffs concede that any "allegations regarding a 5% transfer tax . . . [do not] relate . . . to [their] underlying theory of liability." (Pls. Opp'n at 59 n.21.) Thus, the alleged scheme is best construed as lasting from 2004 to 2014.

medallion market at the expense of medallion owners who relied on Defendants' false statements and the market's false prices, and who now face financial losses as a result of the market's collapse. The core components of the scheme as alleged are as follows.

**A. Component One: Inflated Upset Prices**

Plaintiffs trace the origin of Defendants' fraudulent scheme to the artificially inflated "upset prices," or minimum sales prices, first used at the 2004 TLC medallion auctions. (See Am. Compl. ¶¶ 11-14, 86-100.) These upset prices created the minimum sales price below which the City refused to accept the purchase or transfer of medallions. (Id. ¶¶ 13, 89-100.) Plaintiffs allege that Bloomberg and Daus were the "chief architects" behind the scheme, deciding in 2003 to sell 1,000 new medallions at inflated prices to help plug the City's budget deficit. (Id. ¶¶ 86-88.) Beyond 2004, Plaintiffs allege these prices were used to create an ever-increasing artificial floor on the medallion market, including on the secondary market, where the City required purchasers to seek exemptions for any medallion sale below what the City considered the fair market value. (Id. ¶¶ 98-100.) In addition to direct revenue from auctions, the City also collected a five percent transfer tax on all private medallion transfers. (Id. ¶ 114.)

**B. Component Two: Collusive Auctions**

The second component of the scheme was alleged collusion at auctions held in April 2004 and June 2006. (Id. ¶¶ 15-19, 101-55.) Each bidder was required to certify on the official TLC bid form ("Bid Form") that they had not disclosed their bids to other bidders or reached agreements with competing bidders. (Id. ¶¶ 107-110; see also id. Ex. H (Bid Form)). Despite these requirements, the TLC accepted sets of identical tiered bids submitted separately by the three Freidman Defendants. (Id. ¶¶ 111, 119.) These collusive bids were successful and helped set the new floor price for future transactions. (Id. ¶¶ 112-13.) Plaintiffs allege that the TLC acquiesced

in this collusion and that prior to the June 2006 auctions, Defendant Fraser, on behalf of the TLC, approved a rule change that facilitated the collusive efforts. (Id. ¶¶ 124-30.)

In June 2006, a representative of the New York City Office of Management and Budget ("OMB") noticed the apparent collusive bidding at the June 16, 2006 auction and raised concerns, prompting an investigation by the New York City Department of Investigation ("DOI"). (Id. ¶¶ 101-03.) DOI's subsequent investigation and report (the "DOI Report"), dated April 2007, confirmed that the identical bids appeared to be the result of pre-bid communications between bidders. (Id. ¶ 101; see also id. Ex. E ("DOI Rep.") at 13.) The DOI Report ultimately identified "three main areas of concern with the TLC medallion auction process"—including an ambiguous non-collusion clause in the Bid Form—which the TLC subsequently updated its rules to address. (DOI Rep. at 24.) However, the TLC did not invalidate the prior auction results, which Plaintiffs allege had the effect of artificially inflating the prices of medallions going forward through 2014. (Am. Compl. ¶¶ 139, 146-55 (documenting the rise in medallion prices over that timeframe).)

**C. Component Three: Concealing the Roth Memo**

The third component of the scheme alleges that while the TLC was allowing medallion prices to artificially rise, it simultaneously had actual knowledge that prices exceeded the medallions' true values and chose to conceal that reality. Specifically, Plaintiffs point to an internal memo produced by TLC Policy Analyst Gary Roth around late 2010 (the "Roth Report"). (Id. ¶¶ 30-42, 156-60; see also id. Ex. D ("Roth Rep.").) Plaintiffs focus primarily on the Roth Report's statement that "[f]rom an agent, fleet and individual owner perspective, the price of the medallion appears to have outstripped its underlying value." (Roth Rep. at 2; see, e.g., Am. Compl. ¶¶ 10, 33, 35-36, 228.) The Roth Report ultimately provided three forward-looking possibilities, and warned that, "[i]f the price of medallions dropped significantly, it could force recent medallion

buyers 'underwater.'" (Roth Rep. at 4-5; Am. Compl. ¶ 32.) The Roth Report first became publicly available at a City Council meeting in June 2019. (Am. Compl. ¶ 38.) Plaintiffs allege the Roth Report was material information that the TLC fraudulently concealed while continuing to knowingly allow medallions to be sold at inflated prices. (Id. ¶¶ 39-42.)

**D. Component Four: False and Misleading Price Reporting**

The fourth component of the scheme involved the TLC intentionally overstating the price of medallions, making false statements regarding the stability of medallion prices, and making other false and misleading statements in various TLC publications, particularly in the 2013-2014 time period. (Id. ¶¶ 20-29, 200-34.) Plaintiffs allege that "on at least 10 occasions between November 2013 and September 2014, the TLC published a knowingly false and misleading report titled 'Sales-Average Prices & Numbers of Transfers,' which purported to document third-party medallion transactions, and which carried the apparent legitimacy of being subject to the TLC's exclusive oversight and approval." (Id. ¶ 21.) Specifically, the TLC deliberately omitted from its average price calculation any transfers that occurred at more than 10% below the average price from the prior month, thereby artificially creating the appearance of a higher-than-average price. (Id. ¶¶ 23-24, 202-08 (listing examples), ¶¶ 207-09 (statement of Defendant Fromberg confirming this practice).) In this same 2013-2014 period, Plaintiffs also allege that the TLC reported that medallion prices remained stable when they actually had begun to fall, and published false and misleading statements and graphics in sales pamphlets and its 2014 "Taxicab Factbook." (Id. ¶¶ 210-34). These included, for example, a statement that an investment in a taxi medallion was "better than the stock market," a graph showing large increases in medallion values, and a suggestion that a central reason for the increase in medallion values was the increase in cab fares. (Id.)

**E. Component Five: False and Misleading Advertising Campaign**

The fifth alleged component of the scheme was a false and misleading advertising campaign through which the City and TLC attempted to generate interest in the 2004 and 2006 auctions. (Id. ¶¶ 43-48, 235-56.) The campaign consisted of TV, radio, newspaper, and internet ads, in addition to materials in the TLC's online and print "TLC Magazine" and its "TLC Times" newsletter. (Id. ¶¶ 43-46, 240-49.) Examples of statements made in such materials were that "New York City taxi cab medallions have a long history as a solid investment" and that a medallion "is collateral that can assist in home financing come college tuition, or even 'worry-free' retirement." (Id. ¶¶ 246-49.) Plaintiffs allege Defendant Daus made similar false claims at several outreach seminars in New York in March 2004, including when he spoke to Plaintiff Soybel. (Id. ¶¶ 255-56.) Plaintiffs allege these statements by Daus and the TLC were at odds with price data from certain prior years showing that medallion values had actually been in decline. (Id. ¶¶ 250-53.)

**F. Concealing the City's Plans Regarding Uber and Lyft**

Though not included as one of Plaintiffs' "five key components" of Defendants' alleged scheme, (see id. ¶ 10), Plaintiffs also allege that the TLC fraudulently concealed a decision to allow ride-hailing apps such as Uber and Lyft into the New York City market without the need to purchase a medallion, (id. ¶¶ 161-99). Plaintiffs specifically allege that on September 21, 2012, Defendant Daus, the prior TLC Commissioner, and Defendant Yassky, the then-TLC Commissioner, made this decision in "a secret agreement" despite that Yassky had previously indicated no such decision had been made. (Id. ¶¶ 162-67.) Plaintiffs allege that the secret plan gave drivers from app-based companies an "enormous—and patently unfair—competitive advantage over medallion owners" and "would prove to be the coup de grace for the New York yellow taxi industry." (Id. ¶¶ 169-79.) Plaintiffs also allege that Yassky and Daus each had their

own motivations for concealing the plan, including personal aspirations in the private sector. (Id. ¶¶ 184-99.) Plaintiffs allege that Daus, Yassky, and "by extension, the TLC," had an obligation to disclose this decision, but instead continued to make false and misleading statements about medallions being "highly profitable" despite "knowing full well that the entry of app-based [for-hire vehicles] . . . would destroy the value of medallions." (Id. ¶¶ 197-99.)

**G. The Collapse of the Medallion Market and Subsequent Fallout**

The April 2004 auctions resulted in what were record prices at the time, with bids reaching $360,000 for a single medallion and $815,103 for a package of two corporate medallions, or $407,551 each. (Id. ¶¶ 262-64.) From 2004 until 2014, "the artificially inflated prices continued on the secondary market and in subsequent TLC auctions." (Id. ¶¶ 265-68.) The 2014 auctions resulted in record prices yet again, and in March 2014—at the City's last medallion auction before the filing of the present action—the TLC set an upset price of $1.7 million for a lot of two wheelchair accessible corporate medallions, with the ultimate high bid being $2,420,500 (or $1,164,378 per medallion). (Id. ¶ 269.)

However, "[b]y mid-2014, medallion market values started to fluctuate and the prices began to significantly decline." (Id. ¶ 273.) In 2015, the City suspended plans for future medallion auctions and in March 2016, Defendant Joshi, the TLC Commissioner, testified that the secondary market for medallions was essentially "frozen." (Id. ¶¶ 273-75.) By the time this action was filed in April 2021, medallion prices had "fallen to an all-time low, worth . . . approximately $50,000 on the open market." (Id. ¶¶ 273-78 (emphasis omitted).) Many medallion owners, including named Plaintiffs, now face financial circumstances which include, but are not limited to, falling behind on loan payments, large outstanding loan balances, defaults, bankruptcies, foreclosures,

and having to place their medallions into "storage" or de facto storage, meaning the medallions cannot be used or leased. (Id. ¶ 279; see generally id. ¶¶ 317-519.)

Public scrutiny began almost immediately and has persisted over time. As Plaintiffs note, the "TLC's fraudulent and deceitful manipulation of monthly sales data" was "exposed by the media in 2014." (Id. ¶ 27.) At least as early as 2015, numerous lawsuits were filed against the TLC and the City for their role in the decline of medallion values. (See, e.g., id. ¶¶ 634-35.)[5] Defendant Joshi herself acknowledged in February 2015 that "[t]here is broad recognition that an artificial bubble in medallion values existed [that was] caused by a few transactions at record-high prices, transactions which were not actually representative of the asset's value." (Id. ¶ 282.) Since that time, various commissions and City officials have opined upon the collapse of the medallion market, with Plaintiffs highlighting in particular certain opening statements of City Councilman Richie Torres from the June 24, 2019 City Council meeting, in which he opined, in part, that "[t]he medallion market collapse is a cautionary tale of what happens when both government and markets are governed not by laws, but by greed." (See, e.g., id. ¶¶ 4, 7, 54, 295-96, 354; see also id. Ex. C ("Torres Tr.").) Plaintiffs also note that New York Attorney General ("AG") Letitia James eventually investigated the City and TLC, resulting in a February 20, 2020 Notice of Claim that made a number of allegations similar to the present case. (Id. ¶¶ 2, 3, 7, 297, 594; id. Ex. A ("AG Notice of Claim"), Ex. B ("AG Statement").) AG James subsequently announced that the AG's office would not commence litigation. (Id. ¶ 301.)

---

[5] For purposes of this factual background, I refer only to investigations and public materials referenced in the Amended Complaint. Extensive additional materials, noted by the City Defendants in their motion to dismiss, are detailed at length in the Discussion below.

## DISCUSSION

Under Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[6] Accordingly, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). "In addition, where a case concerns allegations of fraud or mistake, Rule 9(b) of the Federal Rules of Civil Procedure requires claims to be pled with particularity." Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc., 17 F. Supp. 3d 207, 219 (E.D.N.Y. 2014) (citing Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.")).

A motion to dismiss based on the statute of limitations is properly treated as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989). Where, as here, the statute of limitations determination involves the question of when Plaintiffs were on inquiry notice, "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008). In addition, although the Second Circuit has recognized that it can be inappropriate to determine whether a plaintiff was on inquiry notice at the motion to dismiss stage, courts in this Circuit have "done so in 'a vast number of cases,'" so long as the "circumstances . . . were sufficiently clear on the face of the complaint and related documents as

[6] The City Defendants moved for dismissal under Rules 12(b)(1) and 12(b)(6). However, because their basis for 12(b)(1) dismissal is lack of standing, (see Defs. Mem. at 3), and because I do not address that argument, (see Discussion infra), I do not recite the 12(b)(1) standard here.

to make the time-bar ruling appropriate." LC Cap. Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 156-57 (2d Cir. 2003) (quoting Dodds v. Cigna Sec., Inc., 12 F.3d 346, 352 n.3 (2d Cir. 1993)); Koch v. Christie's Int'l PLC, 699 F.3d 141, 153 (2d Cir. 2012) (affirming dismissal of RICO claims on statute of limitations grounds at motion to dismiss stage).

## I. Statute of Limitations

For the reasons that follow, I conclude that all of Plaintiffs' claims—which are based on conduct that took place between seven and seventeen years prior to the filing of this lawsuit—are untimely and dismissal is warranted under their respective statutes of limitations.[7]

### A. Civil RICO Claims

Civil RICO claims are subject to a four-year statute of limitations. Koch, 699 F.3d at 148 (citing Rotella v. Wood, 528 U.S. 549, 552 (2000)). "Federal courts . . . generally apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is here." Id. (quoting Rotella, 528 U.S. at 555). In civil RICO cases, the Second Circuit applies a "discovery accrual rule" in which "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Id. (quoting Rotella, 528 U.S. at 555). Thus, the limitations period begins when a plaintiff has either actual or inquiry notice of their injury. Id. at 151 (citing In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998)). Plaintiffs' contention—supported by citations

[7] Although I do not address the City Defendants' numerous other arguments for dismissal, I do note that as to Defendant TLC specifically, the City Defendants argue that "New York City Charter § 396 sets forth very clearly that '[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York, and not in that of any agency, except where otherwise provided by law.'" (Defs. Mem. at 1 n.1 (emphasis omitted).) The Second Circuit has indeed held that under § 396, City agencies are non-suable and cannot be held liable. Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007); see also Carpenter v. City of New York, No. 09-cv-4524 (ARR) (LB), 2010 WL 2680427, at *4 (E.D.N.Y. June 30, 2010) ("[O]rganizational subdivisions of the City of New York are not suable entities."). I agree with the City Defendants that the TLC is not a proper party. That said, in reviewing the motion to dismiss I have construed any claims brought against the TLC as against the City. See Alleva v. N.Y.C. Dep't of Investigation, 696 F. Supp. 2d 273, 276 n.2 (E.D.N.Y. 2010) ("When claims 'are brought against non-suable entities,' the Court may construe them 'as brought against the City of New York.'" (quoting Thompson v. Grey, No. 08-cv-4499 (JBW), 2009 WL 2707397, at *5 (E.D.N.Y. Aug. 26, 2009)), aff'd, 413 F. App'x 361 (2d Cir. 2011)).

to securities cases, not RICO cases—that "[i]nquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiffs discovered or should have discovered the fraudulent conduct," is not an accurate statement of the test. (See Pls. Opp'n at 13 (emphasis omitted) (citing securities fraud cases).) The Second Circuit has expressly rejected the argument that "a RICO plaintiff must have discovered the facts showing the fraud, including scienter," before inquiry notice is triggered, holding that "[i]t remains the law in this Circuit that a RICO claim accrues upon the discovery of the injury alone." Koch, 699 F.3d at 149-50.

In Koch, the Second Circuit adopted a framework for when inquiry notice occurs in civil RICO cases. Id. at 151 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005)). As an initial matter, "where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises." Id. (quoting Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983)). "A duty to inquire is triggered by information that relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants," though "the triggering information need not detail every aspect of the subsequently alleged fraudulent scheme." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013) (internal quotation marks and citation omitted). Once that duty arises, if a RICO plaintiff investigates, then "the Court must determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date." Koch, 699 F.3d at 153. On the other hand, "when a RICO plaintiff 'makes no inquiry once the duty arises, knowledge [of the injury] will be imputed as of the date the duty arose.'" Id. (quoting Lentell, 396 F.3d at 168).

Plaintiffs commenced the present lawsuit on April 6, 2021. (See D.E. # 1.) Plaintiffs attribute their injuries from the City's alleged RICO scheme to events well beyond the applicable

four-year limitations period. (See Pls. Opp'n at 13 ("Plaintiffs have alleged a fraudulent scheme that took place for over a decade, from 2004 to 2014.") (emphasis omitted); see also, e.g., Am. Compl. ¶¶ 55, 547, 556.) However, Plaintiffs argue that they were not on inquiry notice until at least June 24, 2019, the date of a City Council Oversight and Investigations Committee meeting on the collapse of the medallion market. (Pls. Opp'n at 13; Am. Compl. ¶ 637.) The City Defendants argue that Plaintiffs were on inquiry notice at least as early as 2015, not only because many of Defendants' actions that serve as the basis for Plaintiffs' RICO claims were public actions taken as far back as 2004, but also because a barrage of public lawsuits and press articles after the market collapse in 2014 constituted "storm warnings" that served to put Plaintiffs on inquiry notice. (Defs. Mem. at 8-20; Defs. Reply at 5-13.) Plaintiffs respond that even if a duty to inquire arose in 2015, they took affirmative steps to investigate that warrant a later claim accrual date. (Pls. Opp'n at 25-26.) In addition to these arguments, Plaintiffs argue that the statute of limitations should be tolled in any event either under the doctrine of fraudulent concealment or the tolling doctrine articulated by the Supreme Court in American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974). (Id. at 21-24, 27-30.)

For the reasons that follow, I hold that there were considerable "storm warnings" that gave rise to a duty to inquire by the end of 2015, that Plaintiffs failed to inquire (and to the extent their limited alleged investigatory steps constituted an inquiry, it was not a reasonable one), and that tolling is not warranted.

**i. Significant "Storm Warnings" Gave Rise to a Duty to Investigate**

Before addressing the array of specific materials that the City Defendants argue put Plaintiffs on inquiry notice of their injuries at least as early as 2015, it is first important to acknowledge the situation Plaintiffs found themselves in at the time, and the broad swath of public

information of which they were undoubtedly aware. By the end of 2015, medallion values had declined significantly from their all-time highs, and Plaintiffs, as owners of such medallions, knew this. They also knew that what had transpired was in stark contrast to what they had been repeatedly told by the City Defendants in prior public statements, namely, that taxi medallions were a reliable investment. Plaintiffs were also aware that the TLC and the City played a significant role in the taxi medallion market: that the TLC set the upset price at auctions, received a five percent transfer tax on all secondary market transactions, produced marketing materials, and was simultaneously the regulator charged with overseeing the New York City taxi industry in general. It would not be unreasonable to conclude that just this public information alone, in light of the market's sudden collapse, might warrant an inquiry into the TLC and City's conduct.

Unsurprisingly, a number of Plaintiffs' peers and others from the medallion industry proceeded to take such action. Of particular note for present purposes were a flurry of lawsuits filed over the course of 2015 against a number of the same exact defendants that Plaintiffs have named in the present case—the City, the TLC, and numerous Individual Defendants—that raised serious allegations relating to the decline in medallion values, the entry of ride-hailing apps into the market, and misconduct on behalf of the City and TLC.[8] The City Defendants here have focused the Court's attention primarily on five such lawsuits and the corresponding coverage of those lawsuits (and coverage of the medallion market collapse in general) in the press. In addition, the City Defendants point back even further to publicly available reports and articles dating as far back as 2007 detailing collusion at earlier auctions. I agree with the City Defendants that these

[8] I take judicial notice of these lawsuits and the other public materials cited by the City Defendants for the "fact that [the materials] contained certain information." See Staehr, 547 F.3d at 425 (emphasis omitted).

materials undoubtedly created "storm warnings" sufficient to give rise to a duty to inquire by the end of 2015, at the latest. See Koch, 699 F.3d at 151.

### 1. Lawsuits

#### a. Melrose Federal Complaint

A review of the numerous lawsuits filed in 2015, which are the predominant focus of the parties' briefing, is an appropriate starting point. The first case relied on by the City Defendants is Melrose Credit Union v. City of New York, No. 15-cv-9042 (AJN) (S.D.N.Y. filed Nov. 17, 2015) (the "Melrose federal" case). (See D.E. # 54 ("Selvin Decl.") Ex. A ("Melrose Fed. Compl.").) The Melrose federal complaint was filed by a coalition of medallion owners, credit unions, and other entities asserting multiple causes of action against the City, the TLC, and Defendant Joshi related to the City and TLC's role in the decline of medallion values. (See id.) Plaintiffs seek to distinguish the Melrose federal complaint as lacking fraud allegations, and as focusing on the City's favorable treatment of ride-hailing apps and the resulting impact on medallion values. (See Pls. Opp'n at 17.) Both arguments are unpersuasive.

First, allegations relating to the "arbitrary, disparate regulatory treatment" of medallion cabs vis-à-vis ride-hailing apps, (see Melrose Fed. Compl. ¶ 1), are not totally detached from Plaintiffs' present claims. Plaintiffs allege here that part of the scheme was the active concealment by the TLC of a decision that would allow ride-hailing apps to operate in New York City without medallions, thereby giving them an "enormous—and patently unfair—competitive advantage." (See Am. Compl. ¶¶ 161-99.) Moreover, simply characterizing the City's treatment of ride-hailing apps as the "central thrust" of the Melrose federal complaint, (Pls. Opp'n at 17), ignores the otherwise extensive overlap with claims in the present lawsuit. Plaintiffs' position that "[i]n actuality, one must scour through the entire Melrose [federal] complaint to find any mention of

fraud," (id. at 15), ignores significant portions of that complaint. Most obvious is that one of the causes of action asserted in Melrose was a state law fraud claim. (Melrose Fed. Compl. ¶¶ 246-59 (Third Cause of Action).) Plaintiffs' position also overlooks the detailed fraud-related allegations in the complaint that serve as the basis for that claim—many of which closely mirror certain of the core allegations here—including on the second page of the Melrose federal complaint in just the fourth paragraph, which reads:

> Finally, Plaintiffs seek to recover compensatory damages caused by Defendants' fraudulent misrepresentations and omissions concerning the fair market value of the New York City taxicab medallion, as reflected in the false and misleading monthly "average" medallion transfer prices published each month on the Taxi and Limousine Commission ("TLC")'s website until late 2014, which was used by the TLC to determine the fair market value of the medallion and calculate the 5% transfer tax collected for New York City on every taxicab medallion transfer. Defendants' deliberate misrepresentations and omissions could only have been intended to artificially inflate medallion prices, further compounding the harm caused to Plaintiffs and the entire taxicab industry.

(Id. ¶ 4.) Plaintiffs rely on the same fundamental allegations here. (See, e.g., Am. Compl. ¶¶ 202-09 (Section titled "TLC's False and Misleading Monthly Average Sales Price Reports").) Indeed, the Melrose federal complaint contains an entire section entitled "The Manipulation of Taxicab Medallion Values," which claimed in part—as do Plaintiffs here—that the TLC made a decision to omit from its monthly average price reports any medallion transfers that were more than 10% below the previous month's average. (Melrose Fed. Compl. ¶¶ 210-28; see also id. ¶¶ 252-53; Am. Compl. ¶¶ 23-24, 207-09, 552, 562, 591, 598, 606.) Furthermore, the Melrose federal plaintiffs alleged the same motivation for the scheme as do Plaintiffs here, alleging that the TLC manipulated its data in a "conscious decision" to:

> . . . intentionally inflate the reported fair market value of the medallion, which in turn allowed the TLC to auction medallions at higher prices, thereby increasing the prices paid to New York City for medallions and allowing the TLC to collect higher transfer taxes on behalf of New York City on private medallion sales.

(Melrose Fed. Compl. ¶ 212; see Am. Compl. ¶ 25 (alleging here, in nearly identical language, a "conscious decision" by the TLC to "intentionally inflate the reported medallion values, thereby enabling the TLC to auction medallions at higher prices, and increase the prices on the secondary market for medallions" which "would allow the TLC to collect higher transfer taxes").) Examples of other allegations similar to those in the Melrose federal complaint are plentiful. (Compare, e.g., Melrose Fed. Compl. ¶ 13 (alleging the TLC made false representations that "New York City taxicab medallions have a long history as a solid investment with steady growth"), with Am. Compl. ¶ 237 (alleging that the "City and TLC continuously promoted ownership of medallions as a 'solid investment with steady growth'"); Melrose Fed. Compl. ¶ 210 (alleging that the "TLC deliberately manipulated the price of taxicab medallions . . . until at least sometime in late 2014" and that the "TLC's posted fair market value was relied upon by industry participants, including several of Plaintiffs in this action, in deciding whether to purchase, hold, sell, or loan against New York City taxicab medallions"), with Am. Compl. ¶ 28 ("[B]efore TLC's policy was exposed [in 2014], the TLC's statements and the TLC's inflated fair market value was relied upon by medallion purchasers and owners, including the Plaintiffs in this action, in deciding whether to purchase, hold, sell, or loan against their taxicab medallions.").) In sum, there is significant overlap between the fraud-based allegations in the Melrose federal complaint and Plaintiffs' fraud-based RICO claims filed five and a half years later.

**b. CGS Complaint**

Another case filed in 2015, CGS Taxi LLC v. City of New York, Index No. 653264/15 (N.Y. Sup. Ct. filed Sept. 30, 2015) (see Selvin Decl. Ex. C ("CGS Compl.")), bears even more

similarity to the present case.[9] CGS was a putative class action, once again naming the City and TLC as defendants, filed in September 2015 by purchasers of medallions at the TLC auctions in 2013 and 2014. (See CGS Compl.) Three of the claims alleged in CGS were fraudulent inducement, negligent misrepresentation, and a claim under New York General Business Law § 349 based on "deceptive acts or practices in the conduct of any business, trade or commerce or the furnishing of any service." (Id. ¶¶ 151-58, 162-69.) The factual allegations underlying those claims, including those in the CGS complaint's very first two paragraphs, bear undeniable similarity to Plaintiffs' fraud-based RICO claims:

> 1. . . . Before the [early 2014] auction, the TLC intentionally overstated the value of taxi medallions and hid the fact that the value of those medallions had already begun to decline due to factors known to the TLC but not disclosed to plaintiffs. . . .
>
> 2. The TLC's misrepresentations, omissions, deceptive acts and practices induced buyers to enter the auction and/or bid too much for the medallions. . . .

(Id. ¶¶ 1-2; see also, e.g., Am. Compl. ¶ 6 (alleging the TLC "intentionally overstated the value of medallions and fraudulently concealed the fact that the value of these medallions had already begun to decline"), ¶ 25 (alleging the TLC "intentionally inflate[d] the reported medallion values, thereby enabling the TLC to auction medallions at higher prices").)

Other detailed allegations throughout the CGS complaint, as with the Melrose federal complaint, cover much of the same ground as Plaintiffs' allegations here. For example, both include allegations that the TLC made fraudulent and misleading statements relating to investments in medallions in the TLC's 2014 Taxicab Factbook. (Compare, e.g., CGS Compl. ¶¶ 71-72, with Am. Compl. ¶¶ 223-26, 599-608 (both discussing statements in Taxicab Factbook,

[9] The attorneys who filed CGS also filed two similar complaints in 2017. (See Selvin Decl. Ex D (Complaint in Singh v. City of New York, Index No. 701402/17 (N.Y. Sup. Ct. 2017), Ex. E (Complaint in Akal Taxi NYC v. City of New York, Index No. 708602/17 (N.Y. Sup. Ct. 2017).) For purposes of this section, I discuss the 2015 CGS complaint.

including statements that compared medallions to investments in the S&P 500 and that attributed high medallion values to increases in cab fares).) Both likewise allege that the TLC intentionally omitted data from its average price reports. (Compare, e.g., CGS Compl. ¶¶ 75-81, with Am. Compl. ¶¶ 202-09 (both discussing the same data and providing a number of the exact same numerical examples from 2013 and 2014 average price reports).) Notably, both complaints rely on the same basic theory of liability: that the misstatements by the City and TLC were material, were knowingly false at the time they were made, and that they were relied upon by the plaintiffs in each respective case. (Compare, e.g., CGS Compl. ¶¶ 162-69, with Am. Compl. ¶¶ 317-519.) As the City Defendants correctly point out, the remarkable overlap is substantial, and in some instances borders on copy-and-pasting from the CGS complaint, as the below side-by-side example makes clear:

| CGS Complaint | Soybel Original Complaint[10] |
|---|---|
| 73. Before the 2014 auction, the TLC issued a pamphlet that affirmatively stated that an investment in a medallion is "better than the stock market." Under that statement, it shows a graph of purported medallion prices from January 2001 to 2014 (present). The graph shows the price of an independent medallion increasing from $200,000 to more than $1 million in early 2014. The graph shows a steep rise during 2013. | 204. [P]rior to the 2014 auction, the TLC issued a pamphlet that affirmatively stated that an investment in a medallion was "**better than the stock market**."<br><br>205. Under that statement, the pamphlet shows a graph of purported medallion prices from January 2001 to 2014. The graph, which depicts a steep rise during 2013, shows the price of an independent medallion **increasing by 500%**, from $200,000.00 to more than $1,000,000.00 in early 2014. |
| 74. These statements, like similar statements made by the TLC over the years, have been widely reported in the financial press. To cite | 206. The above statements, like similar statements made by the TLC over the years, were widely reported in the news media and in |

[10] These paragraphs are taken from the Original Complaint in this action, (see D.E. # 1), not the Amended Complaint. The City Defendants noted this comparison in their original motion to dismiss, prior to Plaintiffs' amendment. Plaintiffs make the same core allegations in their Amended Complaint, though they have further altered the wording. (See Am. Compl. ¶¶ 214-17.)

| | |
|---|---|
| just one example, in November 2013, on the eve of the first of the recent auctions, the Wall Street Journal, citing data from the TLC, reported that the value of a NYC taxi medallion "Outpace[d] Gold and the Dow Jones Industrial Average." The article quoted then TLC chairman David Yassky saying, "Taxi cab ownership is highly profitable and that's why investors are willing to pay these prices." | the financial press. For example, in November 2013, on the eve of the first of the 2013/2014 auctions, the Wall Street Journal, citing alleged "data" from the TLC, reported that the value of a NYC taxi medallion "Outpace[d] Gold and the Dow Jones Industrial Average."<br><br>207. The article quoted David Yassky, who was then the TLC Chairman saying that "*Taxi cab ownership is highly profitable and that's why investors are willing to pay these prices*." |

Thus, to an even greater extent than the Melrose federal complaint, the similarities between the CGS allegations from 2015 and those brought here are too extensive to seriously contest.

**c. Other Lawsuits**

Although the Melrose federal complaint and CGS complaint bear the most striking similarities to the present action, the City Defendants reference significant overlap in additional public court proceedings filed in 2015. (See Defs. Mem. at 12-13, 16-18.) In Melrose Credit Union v. City of New York, Index No. 6443/15 (N.Y. Sup. Ct. filed May 26, 2015) (the "Melrose state" case), (see Selvin Decl. Ex. B ("Melrose State Pet.")), plaintiffs were credit unions who provided medallion financing and filed a New York C.P.L.R. Article 78 proceeding against the City, the TLC, Defendant Joshi, and former New York AG Eric Schneiderman. (See Melrose State Pet.) The Melrose state petition alleged in part that:

> [I]t appears that the TLC deliberately manipulated the price of taxicab medallions, until at least sometime in 2014, by overstating the monthly average price of taxi medallions published on the TLC website, which was then relied upon by industry participants, including to underwrite medallion loans. Specifically, it appears that the TLC purposely omitted from its monthly average prices, any medallion transfers that were more than 10% below the highest transfer prices from the prior month—thereby driving higher medallion transfer taxes and ultimately higher auction prices for medallions being purchased from New York City.

(Melrose State Pet. ¶ 81.) And the Plaintiffs in that case, as in CGS, highlighted examples of inflated prices that correspond exactly with some of those relied on here, (compare Melrose State Pet. ¶ 82, with Am. Compl. ¶ 205); noted that Commissioner Joshi openly acknowledged in 2015 that an "artificial bubble" had existed in the medallion market, (compare Melrose State Pet. ¶ 84, with Am. Compl. ¶¶ 281-82); and highlighted the TLC's role in setting upset prices at auctions and determining the fair market value for purposes of assessing the five percent transfer tax, (compare Melrose State Pet. ¶ 85, with Am. Compl. ¶¶ 50, 286). Finally, the case of Glyka Trans LLC v. City of New York, Index No. 10057/15 (N.Y. Sup. Ct. filed Apr. 2, 2015), (see Selvin Decl. Ex. F ("Glyka Pet.")), while it did not include fraud-based allegations, still recounted in detail the harsh financial impact of the drop in medallion values on medallion owners and noted the steep financial rewards the City had reaped over the years from auctions and medallion sales. (See, e.g., id. ¶¶ 8, 13-42, 95-100.)[11]

As it has been succinctly put by the City Defendants: "Plaintiffs cannot dispute that their claimed injury is the diminution of medallion values, the same injury complained of in numerous earlier lawsuits filed against the City and TLC, nor can they dispute that those earlier lawsuits referenced in whole, or in part, elements of the professed fraudulent scheme alleged in this case." (Defs. Reply at 5.) These 2015 lawsuits were filed by everyone from fellow medallion owners to the associations that represented them and the credit unions that they borrowed from to finance

---

[11] The City Defendants also point to a fifth lawsuit, Greater New York Taxi Ass'n v. City of New York, No. 13-cv-3089 (VSB) (S.D.N.Y. filed July 23, 2015) ("GYNTA"). (See Selvin Decl. Ex. G ("GYNTA Compl.")). That case involved an unconstitutional retaliation claim brought by Evgeny Freidman, here a Defendant, against the City, the TLC, Bloomberg, and Daus, amongst other claims. (See id. ¶¶ 149-73.) The City Defendants vaguely speculate that Freidman's position as a plaintiff in that case—in which he sued various City Defendants—necessarily undermines the allegations here that he colluded with certain of those City Defendants many years prior. (Defs. Mem. at 17-18.) Without opining on that theory, suffice to say that the City Defendants do not present convincing reasons why the GYNTA case would have contributed to inquiry notice of Plaintiffs' alleged injuries here. And I find there is no need to consider the case in any event, as the other lawsuits, press coverage, and materials cited by the City Defendants and discussed at length herein are more than sufficient to have placed Plaintiffs on inquiry notice of their injuries.

their purchases. The lawsuits were brought directly against a number of the same defendants as here, most notably the City and TLC. The existence of similar past lawsuits can serve as "storm warnings" that put plaintiffs on inquiry notice. See, e.g., LC Cap. Partners, 318 F.3d at 153-55; Zirvi v. Flatley, 838 F. App'x 582, 585-86 (2d Cir. 2020) (summary order). As detailed further below, Plaintiffs' attempts to distinguish these lawsuits overlook that in order for a duty to inquire to arise, "the triggering information need not detail every aspect of the subsequently alleged fraudulent scheme." Cohen, 711 F.3d at 361. In light of the sheer number of these cases, that the City and TLC were implicated in all of them, that they were brought by fellow medallion owners and others in the New York City taxi industry, and most importantly, that a number of the core allegations contain "information that 'relates directly to the misrepresentations and omissions the Plaintiffs'" now allege here, see id. (citation omitted), I find that these public court proceedings alone provided sufficient storm warnings to give rise to a duty to investigate.

**2. Media Coverage**

But the lawsuits themselves were not the only indicators of the City and TLC's wrongdoing. The extensive press coverage of these lawsuits, as well as coverage of the medallion market collapse in general, created a duty to inquire. As with prior lawsuits, courts may consider press coverage in determining whether Plaintiffs had inquiry notice. See Koch v. Christie's Int'l PLC, 785 F. Supp. 2d 105, 112-13 (S.D.N.Y. 2011), aff'd, 699 F.3d 141 (2d Cir. 2012); Stewart v. Loring Ests. LLC, No. 18-cv-2283 (MKB) (SMG), 2020 WL 3002363, at *11 (E.D.N.Y. Feb. 26, 2020), report and recommendation adopted sub nom., Parsaram v. Chi. Title Ins. Co., 2020 WL 1231783 (Mar. 13, 2020); see also Staehr, 547 F.3d at 427-28 (quoting Rochelle v. Marine Midland Grace Tr. Co., 535 F.2d 523, 532 (9th Cir. 1976) ("Information in public records or

published by the news media may be so massive that investors will not be heard to say that they remained ignorant of the financial plight of the corporation involved.”)).

The City Defendants cite nearly twenty examples of online news articles covering the aforementioned lawsuits alone, appearing in publications ranging from CNBC, Politico, the New York Post, CBS, the Guardian, and others. (See Defs. Mem. at 10-17.) This is in addition to articles from the same 2014-2015 timeframe from such public news sources as the New York Times and CNN Money that reported generally on declining medallion values, including numerous articles that specifically mentioned false price data published by the TLC. (Defs. Mem. at 18-20); see, e.g., Josh Barro, Under Pressure From Uber, Taxi Medallion Prices Are Plummeting, N.Y. TIMES (Nov. 27, 2014), www.nytimes.com/2014/11/28/upshot/under-pressure-from-uber-taxi-medallion-prices-are-plummeting.html (stating in second paragraph that “[p]revious figures published by the city’s Taxi and Limousine Commission . . . appear to have been incorrect, and the commission removed them from its website after an inquiry from The New York Times”); Josh Barro, How Our Taxi Article Happened to Undercut the Efficient Market Hypothesis, N.Y. TIMES (Dec. 3, 2014), www.nytimes.com/2014/12/04/upshot/how-our-taxi-article-happened-to-undercut-the-efficient-market-hypothesis.html (“The Taxi and Limousine Commission published these [inaccurate] reports alongside apparently complete lists of medallion transactions. By reading those complete lists, an investor could (as I did) figure out that the city’s average reports were wrong, and that medallion prices were actually declining.”); Chris Isidore, New York City’s yellow cab crisis, CNN MONEY (July 22, 2015), www.money.cnn.com/2015/07/21/news/companies/nyc-yellow-taxi-uber/index.html. Indeed, as Plaintiffs themselves openly acknowledge in the Amended Complaint, the “TLC’s fraudulent and deceitful manipulation of monthly sales data . . . was finally exposed by the media in 2014.” (Am.

Compl. ¶ 27.) I therefore find that these articles likewise contributed to the significant "storm warnings" that existed and created a duty to inquire by at least the end of 2015.

**3. Plaintiffs Cannot Evade These "Storm Warnings"**

In response to the abundant material raised by the City Defendants, Plaintiffs advance various arguments for why there was no inquiry notice. First, Plaintiffs argue that "none of the prior lawsuits involved the same claims that Plaintiffs are alleging in this action." (Pls. Opp'n at 14.) But they offer no support for the proposition that inquiry notice is triggered only if lawsuits allege the exact same causes of action. And as already discussed, even putting the extensive factual overlap aside, numerous of the prior lawsuits did indeed allege claims very similar to the fraud-based RICO claims that Plaintiffs assert here. (See Melrose Fed. Compl. ¶¶ 246-59 (New York state fraud claim); CGS Compl. ¶¶ 151-54 (New York General Business Law § 349 claim based on "deceptive acts or practices in the conduct of any business, trade or commerce or the furnishing of any service"), ¶¶ 155-58 (fraudulent inducement claim), ¶¶ 162-69 (negligent misrepresentation claim).)

Next, Plaintiffs contend that the "central thrust" of most of the lawsuits and articles was that the City's "permissive attitude" toward ride-hailing apps—and its "arbitrary, discriminatory, and otherwise unlawful decision" to allow such apps into the market without the need for medallions—had caused medallion values to decline. (See Pls. Opp'n at 14-15, 17-18.) Plaintiffs seek to distinguish these allegations from their core claim, which is targeted at Defendants' years-long fraudulent scheme to inflate medallion values. This argument is unpersuasive for the same reasons already discussed in the context of the Melrose federal case. First, the allegations regarding ride-hailing apps are not completely divorced from those made here, where Plaintiffs have alleged as part of the scheme that a decision to allow those apps to enter the market without

medallions was concealed. (See Am. Compl. ¶¶ 161-99.) And second, the fact that the earlier lawsuits may have had a "central thrust" that is different from the present action ignores that there is still significant overlap with the claims asserted herein, and that other plaintiffs—a number of them medallion owners—raised in 2015 claims very similar in substance to those that Plaintiffs here have waited nearly six years to bring.

Finally, Plaintiffs attempt to minimize the similarities in factual allegations between this lawsuit and the prior lawsuits as being "confined to the City's actions between 2013 and 2014," which they argue "could not have put Plaintiffs on inquiry notice of the City's fraudulent conduct prior to those dates, i.e., from 2004 to 2012." (Pls. Opp'n at 15; id. at 17 (arguing that the City's misconduct from 2013-2014 "would not provide inquiry notice for class members who purchased their medallions prior to 2013").) Plaintiffs' argument is unpersuasive for several reasons. First, as a factual matter, some of the earlier lawsuits are not constrained to the 2013-2014 time period and contain allegations from earlier years, particularly the Melrose federal case. (See, e.g., Melrose Fed. Compl. ¶ 210 (alleging the TLC manipulated prices "until at least sometime in late 2014," but not specifying a starting point), ¶¶ 213, 222 (alleging that, "[f]or example, . . . the averages posted by the TLC in the spring of 2012 . . . were false and misleading" and "Plaintiff KL Motors relied on TLC's determination of fair market value . . . in connection with the purchase of its medallions in March 2012").)

Second, the extent of the overlap in allegations from the 2013-2014 time period alone is substantial, and these similarities are not undermined by the fact that the prior cases focused more exclusively on that timeframe. Here, one of the "key components" of Plaintiffs' alleged scheme, (Am. Compl. at 3), is that the TLC published false average price data and misleading statements in the 2013-2014 period, the exact allegation appearing in numerous prior lawsuits and detailed in

prior news stories. Such allegations would undoubtedly constitute "storm warnings," if not actual notice of injury, for any owner who bought a medallion at that time, or even those owners who decided to retain a medallion rather than sell it. Here, two of the seven named Plaintiffs have alleged purchasing medallions at the 2013-2014 auctions. (See Id. ¶ 379 (Shapiro), ¶ 410 (Tsitiridis).) Another, Plaintiff Roberts, has also alleged purchasing medallions in both 2013 and 2014, either on the secondary market or at auctions. (Id. ¶ 444.) A fourth, Plaintiff Kaminker, bought no medallions during the Class Period but specifically alleges that she considered selling her medallion in 2014 and decided not to based on such statements by the TLC. (Id. ¶¶ 351-53.) And two of the remaining three named Plaintiffs have alleged generally that they relied on the TLC's false statements throughout the Class Period in making decisions to retain their medallions, which they retained through at least 2014. (Id. ¶ 490 (Steven Newman), ¶ 516 (Rod Newman).)

Third, Plaintiffs are incorrect to suggest that extensive allegations of misconduct by the City in 2013 and 2014 could not have constituted "storm warnings" for owners who purchased their medallions prior to 2013. For a duty of inquiry to arise, the "triggering information need not detail every aspect of the subsequently alleged fraudulent scheme." Cohen, 711 F.3d at 361. And in RICO cases specifically, "discovery of the injury alone" determines when a claim accrues; discovery of all elements of the fraud is not required. Koch, 699 F.3d at 150. Troublesome allegations and public news articles indicating the City and TLC had intentionally published false data to inflate prices in the 2013-2014 time period is entirely relevant "triggering information" for all medallion owners to inquire whether they, too, had been led astray by false information. See Cohen, 711 F.3d at 361. This is particularly so in light of the circumstances during which this information came to light in 2015, when the value of all medallions—not just those purchased at the 2013-2014 auctions—had suddenly plummeted. Moreover, such information would be even

more "triggering," id., for those medallion owners who had themselves relied on earlier, similar statements by the City and TLC in deciding to purchase or hold onto their medallions, which is something that every named Plaintiff who purchased earlier in the Class Period has alleged they did.

Fourth, there is yet another fundamental problem with Plaintiffs' attempt to confine the storm warnings to the City's conduct in 2013 and 2014: public materials and articles dating all the way back to 2007 provided additional storm warnings related to the earlier components of the alleged scheme as well. Specifically, in May 2007 the Department of Investigation published its detailed 28-page report on the collusion at the 2004 and 2006 auctions. (See generally DOI Rep.) That report has remained publicly available since then. See N.Y.C. Dep't of Investigations, May 2007 Press Releases, https://www.nyc.gov/site/doi/newsroom/press/2007/may.page. The DOI Report detailed at length many of the key aspects of the collusion that Plaintiffs now seek to recast fourteen years later as part of their fraud-based RICO claim, such as the coordination by the Freidman Defendants and rule changes implemented by the TLC prior to the June 2006 auction. (See DOI Rep.) Plaintiffs' counsel's attempt at oral argument to downplay the DOI Report as an esoteric DOI investigation that no one in the public would know about unless they were seeking it is unconvincing for several reasons. First, the relevant individuals here are not just anyone in the public—they are taxi medallion owners, a number of whom participated in the very auctions at issue, and to whom the subject matter of the investigation would be far from esoteric. Second, Plaintiffs' argument is belied by the fact that the DOI Report and collusion were reported on by the press, including by the New York Times, the New York Post, and the TLC's very own magazine. See Ray Rivera, City to Change Taxi Rules After Inquiry Into Bidding, N.Y. TIMES (May 5, 2007), www.nytimes.com/2007/05/05/nyregion/05taxi.html; Maggie Haberman, Taxi

'Cads' Spur Medallion Reform, N.Y. POST (May 5, 2007), www.nypost.com/2007/05/05/taxi-cads-spur-medallion-reform/; DOI Investigation Of Taxi And Limousine Commission Medallion Auction Finds Loopholes In Rules, TLC MAGAZINE ONLINE (May 4, 2007), https://tlc-mag.com/archive_issues/archive_june07.html.

As a final matter, I note that just as Plaintiffs cannot escape a finding of inquiry notice by attempting to limit the extent of factual overlap to allegations from the 2013-2014 period, they also cannot do so by simply pointing to specific components of their alleged scheme and arguing that the prior cases and articles did not reference all of the same components. (See, e.g., Pls. Opp'n at 13.) In particular, Plaintiffs emphasize the fact that "none of the lawsuits or media coverage even mention 'upset prices,'" which are the minimum sales prices set at auctions that Plaintiffs claim the TLC artificially inflated in 2004 and over the Class Period. (Id.) First, Plaintiffs' contention that upset prices go unmentioned in the prior public materials is inaccurate as a factual matter. (See, e.g., Melrose State Pet. ¶¶ 84-85 (alleging that "TLC is specifically charged with setting the minimum upset price at auctions" and that the "artificial bubble" acknowledged by TLC Commissioner Joshi was "actually created and orchestrated by the TLC itself").) And second, to reiterate, for a duty of inquiry to arise the "triggering information need not detail every aspect of the subsequently alleged fraudulent scheme." Cohen, 711 F.3d at 361. As already explained, here there were significant signs of inflated prices and misconduct on behalf of the City and TLC, and the mere fact that "upset prices" were not featured as prominently in those public materials does not undermine the otherwise extensive similarities with Plaintiffs' claims.

In sum, a significant portion of the allegations in the Amended Complaint pertain to the City and TLC's conduct surrounding the 2004 and 2006 auctions and the 2013-2014 time period. Plaintiffs simply cannot ignore that many of the core allegations of their Amended Complaint are

based in large part on information from those periods that has been known to the public for anywhere from five-and-a-half to fourteen years prior to the date Plaintiffs finally brought suit. In light of the swath of publicly available materials, sufficient storm warnings existed by the end of 2015 to at the very least prompt Plaintiffs to investigate their injuries.[12]

### ii. Plaintiffs' Failure to Inquire

Faced with significant evidence that they were on inquiry notice at least as early as the end of 2015, Plaintiffs point to certain limited allegations from the Amended Complaint to argue that Plaintiffs Soybel and Kaminker pursued an investigation such that the Class's claims should not be found to have accrued in 2015. As discussed, once a duty of inquiry has arisen, if a RICO plaintiff pursues an investigation, then "the Court must determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date." Koch, 699 F.3d at 153 (citing Lentell, 396 F.3d at 168). On the other hand, "when a RICO plaintiff 'makes no inquiry once the duty arises, knowledge [of the injury] will be imputed as of the date the duty arose.'" Id. (quoting Lentell, 396 F.3d at 168). Here, I find that Plaintiffs' allegations do not support that an inquiry was pursued once the duty to investigate arose. Even if the limited allegations of investigation by Plaintiffs Kaminker and Soybel can be said to constitute an inquiry, I find that it was not a "reasonably diligent

[12] Plaintiffs briefly suggest, including at oral argument, that the issue of inquiry notice should not be resolved without some form of limited discovery. Discovery is unnecessary where, as here, the "circumstances . . . [are] sufficiently clear on the face of the complaint and related documents as to make the time-bar ruling appropriate on a motion to dismiss." LC Cap. Partners, 318 F.3d at 157; see also Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996) ("[T]he [inquiry notice] test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves."). Indeed, courts in this Circuit have made this exact determination without any discovery in "a vast number of cases," LC Cap. Partners, 318 F.3d at 156, including not only civil RICO actions, but also securities cases that involve an even higher inquiry notice standard requiring plaintiffs to have notice of facts constituting the fraud—not just their injuries—in order for claims to accrue. See, e.g., Koch, 699 F.3d at 153; Dodds, 12 F.3d at 352 & n.3; In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000); Ramiro Aviles v. S & P Glob., Inc., 380 F. Supp. 3d 221, 278-79 (S.D.N.Y. 2019).

investigation," id., and that such an investigation would have revealed the injuries at the end of 2015.

First, the bare-bones allegations of investigative steps that Plaintiffs rely on are limited to certain actions of just two Plaintiffs, Kaminker and Soybel, that were not taken until the fall of 2017. (See Am. Compl. ¶¶ 644-54, 657-59.) That is, no investigative steps are alleged to have been pursued for three-and-a-half years after the market's collapse, and for nearly two years after the time that significant storm warnings had appeared. Furthermore, the actual extent of the investigative steps alleged to have been taken is insufficient to constitute an inquiry such that the claim accrual date should be extended beyond the end of 2015. In fact, nearly all of the actions cited in the Amended Complaint do not appear to have been investigatory in nature, appearing instead to be part of an advocacy campaign undertaken in an attempt to convince the City and TLC to alter their policy stance toward ride-hailing apps such as Uber and Lyft.

The primary basis that Plaintiffs rely on to demonstrate that they pursued an investigation is that "starting in 2017, Plaintiff Kaminker joined the Taxi Medallion Owner Driver Association ('TMODA')," and participated in various rallies, as well as meetings with New York State and City officials. (Id. ¶¶ 645-48.) They also offer some limited allegations that Soybel contributed to these same activities from afar. (Id. ¶¶ 653-54.) Notably absent from the Amended Complaint are any allegations that Kaminker or TMODA made inquiry at their alleged meetings with various City and State officials regarding the TLC's manipulation of data in average price reports, prior collusion at the 2004 and 2006 auctions, or any other potential cause of the market collapse. Their goal was to influence ride-hailing app regulation and policy. (See, e.g., id. ¶ 644 ("Plaintiff Soybel and Kaminker took affirmative steps to protect their rights and hold the TLC and City accountable for destroying medallion values by allowing Uber and Lyft to enter New York without being

required to purchase a medallion."), ¶ 646 (noting that "[o]n its website, TMODA states that it is dedicated to stopping app based companies, such as Uber and Lyft, from operating in New York without being regulated by the Taxi and Limousine Commission to the same extent as the taxi medallion") (internal quotation marks omitted), ¶ 647 (stating that "[i]n furtherance of this goal, TMODA organized multiple rallies and protests against TLC based on its lax policies towards Uber and Lyft"), ¶ 653 (alleging that Soybel proposed ideas "for forcing the City to change its policy and impose the same regulations on Uber and Lyft that they had imposed on medallion owners"); see also id. ¶¶ 645, 648, 652.) As already discussed at length, ample publicly available materials existed dating as far back as May 2007 that collusion had taken place at the 2004 and 2006 auctions, and from all throughout 2014 and 2015 indicating that the City had intentionally manipulated medallion price data in the leadup to the 2013-2014 auctions. And as Plaintiffs themselves acknowledge, the "TLC's fraudulent and deceitful manipulation of monthly sales data" was "exposed by the media in 2014." (Id. ¶ 27.) Yet no inquiry into any such topic is alleged to have been pursued by a single Plaintiff.[13]

In sum, Plaintiffs' pointing to Kaminker's advocacy work as part of the TMODA does not constitute an investigation into their injuries. I also find that Plaintiffs are not saved by their additional limited allegations that after the New York Attorney General announced an investigation in 2020, Soybel and Kaminker engaged in communications with the office to purportedly assist. (See id. ¶¶ 657-59.) Not only do these allegations again involve only Kaminker

[13] I also note that Plaintiffs have provided no authority to support why an investigation undertaken by just one or two individuals, even if it were reasonably pursued, should preserve the claims of the other Plaintiffs and a large proposed Class who have alleged no investigative steps whatsoever. To do so would seem particularly unreasonable given the circumstances here, where one of those two individuals (Kaminker) is unique in that she is not even alleged to have purchased a medallion during the Class Period, (Am. Compl. ¶¶ 347-53), and the other (Soybel) is barely alleged to have participated in the investigation at all, (id. ¶¶ 653-54 (alleging only that Soybel "closely followed TMODA's activities and remained in constant contact with Kaminker and other TMODA members" and "frequently propose[d] his ideas," which Kaminker "would then often repeat, and advocate for" in the meetings)).

and Soybel, but they took place in 2020 after the four-year limitations period had passed, and in any event cannot excuse Plaintiffs' failure to investigate their injuries up to that point. In conclusion, I find that Plaintiffs were on inquiry notice of their RICO injuries by the end of 2015 at the latest, and that knowledge of their injuries is properly imputed to them at that time in light of their failure to inquire. See Koch, 699 F.3d at 153. Even if Kaminker's actions can be said to constitute an investigation, it was not a reasonable inquiry. See id.

**iii. Tolling is Not Warranted**

**1. Fraudulent Concealment**

Plaintiffs argue that the limitations period should be tolled under the doctrine of fraudulent concealment. A court may toll the limitations period under this doctrine "if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." Koch, 699 F.3d at 157 (internal quotation marks omitted) (quoting Corcoran v. N.Y. Power Auth., 202 F.3d 530, 543 (2d Cir. 1999)). In their opposition, Plaintiffs discuss only the City and TLC's concealment of the Roth Report as a basis for tolling under the doctrine of fraudulent concealment, so that is the only basis I consider. (See Pls. Opp'n at 21-24 ("Here, the Roth Report is the critical piece of evidence showing that the City knew exactly what it was doing.").)[14] Though Plaintiffs do not explicitly state the precise period they

[14] Plaintiffs' Amended Complaint also alleges that the TLC "fraudulently concealed" a decision made in a 2012 "secret meeting" between Defendants Yassky and Daus to allow ride-hailing apps to operate in New York City without medallions, (see Am. Compl. ¶¶ 161-99), though Plaintiffs do not argue this fact as a basis for tolling in their opposition. I find this would not satisfy the elements for tolling under fraudulent concealment in any event in light of the extensive public information dating as far back as 2011, cited by the City Defendants, detailing Uber's entry into the New York market and the City's permissive stance, as well as the aforementioned 2015 lawsuits that contained significant material related to this same issue. (See, e.g., Melrose Fed. Compl. ¶ 1 (describing lawsuit as arising amidst the "government-sanctioned proliferation" of smartphone technology being used by companies like Uber "to bypass

wish to have tolled, their argument appears to be that all time prior to June 2019 should be tolled because that is when they learned about the Roth Report. (See id. at 21.) I find tolling is not warranted for multiple reasons.

**a. Concealment of Material Facts**

As an initial matter, it is doubtful whether the Roth Report contained "material facts" that render it a document that would warrant tolling in the first instance. See Koch, 699 F.3d at 157. The Roth Report was a single internal memorandum documenting an analysis conducted by a TLC policy analyst. The report, and the statement from the report that Plaintiffs continually cite—that "the price of the medallions appears to have outstripped its underlying value"—was not based on any secret or proprietary information available only to the TLC. (See Roth Rep.) Rather, the analysis was based on medallion prices, income generated by medallions, common loan terms, and outstanding loan amounts—in other words, all information that medallion owners themselves would have been well-acquainted with from their first-hand experiences. The types of calculations performed and conclusions reached are the kind of comparisons that medallion owners themselves would have been expected to make. (See, e.g., id. at 2 ("Even with $100,000 in fares, this barely pays for the medallion mortgage and operating costs.").) Thus, while it is sufficient to hold that tolling is not warranted due to fraudulent concealment because Plaintiffs have also failed to satisfy the next two prongs, it is doubtful as an initial matter that "material facts" were concealed at all.

---

taxicab medallions"); Melrose State Pet. ¶ 5 (alleging TLC made attempts to "exceed its authority and legitimize Uber's acceptance of illegal hails"); see also Defs. Mem. at 23-24 & n.25 (listing additional materials).) Plaintiffs could not show, in light of these materials, that alleged concealment of this 2012 meeting "prevented [Plaintiffs'] discovery of the nature of [their] claim." See Koch, 699 F.3d at 157 (quoting Corcoran, 202 F.3d at 543).

**b. Discovery of the Nature of the Claim**

Second, Plaintiffs have failed to show that the concealment "prevented [their] discovery of the nature of the claim within the limitations period." Koch, 699 F.3d at 157 (quoting Corcoran, 202 F.3d at 543). As has been discussed at length, by 2015 significant details were publicly available documenting many of the allegations brought in the present case, including prior lawsuits based on fraud-based theories similar to those asserted herein. Plaintiffs cannot simply point to their lack of access to one internal TLC memo to argue that its concealment prevented their "discovery of the nature of the claim," id., when a number of similar such claims had already been alleged. Furthermore, Plaintiffs attempt to argue that, although there may have been other pre-existing evidence that the City and TLC had injured Plaintiffs, the Roth Report's concealment still warrants tolling because plaintiffs asserting fraud-based claims "must demonstrate that the defendant had a 'conscious knowing intent to defraud,'" and the Roth Report was the "critical piece of evidence" in that regard. (Pls. Opp'n at 21-22.) But even if the Roth Report is taken as important evidence of knowledge or scienter, Plaintiffs' argument again overlooks that the Second Circuit in Koch expressly rejected that "a RICO plaintiff must have discovered the facts showing the fraud, including scienter," in order for their claim to accrue. 699 F.3d at 149. Thus, failure to establish the second prong provides another independent basis upon which to reject Plaintiffs' request for tolling based on fraudulent concealment.

**c. Reasonable Diligence**

Third, for much the same reasons I have already found persuasive in holding that Plaintiffs failed to adequately investigate the claims they now seek to bring, I likewise hold that Plaintiffs have not "exercised due diligence in pursuing the discovery of the claim during the period [Plaintiffs] seek[] to have tolled." Id. at 157 (quoting Corcoran, 202 F.3d at 543); see also id.

("Reasonable diligence is a prerequisite to the applicability of equitable tolling."); Klehr v. A.O. Smith Corp., 521 U.S. 179, 194 (1997) ("[A RICO] plaintiff who is not reasonably diligent may not assert fraudulent concealment." (internal quotation marks omitted)). Again, due to the limited nature of any allegations of a diligent investigation, and the fact that any supposed investigation by Soybel and Kaminker did not probe the TLC's manipulation of prices, collusion at the 2004 and 2006 auctions, or any potential reason for the drop in medallion values apart from Uber and Lyft's entries into the market, I find that Plaintiffs have failed to satisfy this prerequisite. As with Plaintiffs' failure to satisfy the first two prongs, this alone is sufficient to reject Plaintiffs' argument for tolling based on fraudulent concealment.

**2. American Pipe Tolling**

Plaintiffs' final argument is that the application of the doctrine set forth in the Supreme Court's decision in American Pipe and Construction Co. v. Utah, 414 U.S. 538, 550-51 (1974), requires tolling. Under this doctrine, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Am. Pipe, 414 U.S. at 554. As the Second Circuit has explained, "tolling is properly extended to claims of absent class members that involve the same evidence, memories, and witnesses as were involved in the initial putative class action." Cullen v. Margiotta, 811 F.2d 698, 720 (2d Cir. 1987), overruled on other grounds, Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987); Benfield v. Mocatta Metals Corp., 26 F.3d 19, 23 (2d Cir. 1994) (tolling RICO claim that "would require evidence of the same or similar wrongful acts and the testimony of the same or similar witnesses" as a previously pled claim based on the same underlying fraudulent acts).

Here, Plaintiffs argue that their RICO claims were tolled under American Pipe based upon the filing of the earlier class action in Singh v. City of New York, Index No. 701402 (N.Y. Sup. Ct. 2017). (See Selvin Decl. Ex D. ("Singh Compl.").) Singh was a putative class action brought against the City and TLC by purchasers of medallions at the 2013-2014 auctions. (See id.) The allegations were twofold: that the City and TLC had overstated the value of medallions in the leadup to the 2013-2014 auctions, and that they had then undermined medallion values after those auctions by permitting "affiliates of [Uber] to acquire licenses to operate black car services despite the affiliates' failure to satisfy the black car licensing requirements and permitting affiliates of Uber to accept street hails . . . ." (See Pls. Opp'n at 29 (quoting Singh Compl).) Plaintiffs' argument is that "[w]hile the legal theories asserted in Singh were different . . . the allegations regarding Defendants' fraudulent conduct at the 2013/2014 auctions provide sufficiently similar factual overlap to trigger American Pipe tolling." (Id.) In making this argument, Plaintiffs attempt to thread a fine needle, having argued that the previously-discussed CGS complaint should not have constituted "storm warnings," but that the Singh complaint—which was filed by the same lawyers as CGS and raised similar allegations—should give them the benefit of tolling.

The Singh case does not warrant tolling under American Pipe. Crucially, Plaintiffs do not address that just nine months after the Singh case was filed in January 2017, the state court dismissed all of the tort-based claims, including all claims based on allegations of fraud and misrepresentations in the leadup to the 2013-2014 auctions. (See D.E. # 57 ("Selvin Reply Decl.") Ex. A ("Singh Op.") at 6 (dismissing first cause of action for deceptive business practices, second cause of action for fraud, fourth cause of action for negligent misrepresentation, and "that part of the fifth cause of action which is for recission of the auction sale of the medallions because of fraud in the inducement").) Yet it is those very claims and the underlying allegations that Plaintiffs

rely on here in an attempt to toll the statute of limitations. (See Pls. Opp'n at 29.) The only claims allowed to proceed beyond September 2017 in Singh were contract law claims for breach of the implied covenant of good faith and fair dealing, and the contract-based portion of the rescission claim, both of which were based on alleged conduct by the City after the 2013-2014 auctions in relation to ride-hailing apps, not alleged fraudulent conduct and misstatements prior to those auctions. (See Singh Compl. ¶¶ 151, 163-64.) Thus, any claims from Singh that would even arguably "require evidence of the same or similar wrongful acts and the testimony of the same or similar witnesses" could toll the limitations period only for a maximum of nine months. Benfield, 26 F.3d at 23. Yet Plaintiffs have filed their case nearly five-and-a-half years after the end of 2015, which is the latest possible time by which I have found Plaintiffs were on inquiry notice. To make their claims timely, Plaintiffs would need their claims tolled for at least 15-16 months, which the Singh case cannot afford them. Thus, without deciding whether such tolling is even warranted, it suffices to say that it would not save Plaintiffs' claims from being untimely.

Furthermore, even if tolling under American Pipe were warranted, it would still require the dismissal of many of the parties and proposed Class members from this lawsuit. First, the only named defendants in Singh were the City and TLC, (Singh Compl. at 1). Application of the American Pipe doctrine would not serve to toll the limitations period as to all other Defendants, given that such tolling does not apply to parties not named in the prior action. Cullen, 811 F.2d at 726 ("Tolling under this theory is available against any person who was a defendant in the earlier class action, but we have held it inapplicable to persons who were not defendants, since commencement of a suit against others is insufficient to give a nondefendant notice of the assertion of claims against him." (citing Am. Pipe, 414 U.S. at 554-55)); see also Arneil v. Ramsey, 550 F.2d 774, 782 n.10 (2d Cir. 1977), overruled on other grounds, Crown, Cork & Seal Co. v. Parker,

462 U.S. 345 (1983). Second, the putative class in Singh only covered purchasers at the 2013-2014 auctions, so Plaintiffs who did not purchase at those auctions—Plaintiffs Soybel, Kaminker, Rod Newman, Steven Newman, possibly Roberts, and all other proposed Class members who fall into this same category—likewise cannot be the beneficiaries of tolling under American Pipe. 414 U.S. at 554 (holding that commencement of a class action can suspend the limitations period "as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action").

In sum, having found that Plaintiffs were on inquiry notice of their injuries by the end of 2015 at the latest, and that there is no basis to toll the limitations period under either doctrine proposed by Plaintiffs, Plaintiffs' RICO claims are time-barred.

**B. Antitrust Claim**

Antitrust claims under Section 1 of the Sherman Act are also subject to a four-year statute of limitations. See 15 U.S.C. § 15b. Antitrust claims are distinct from RICO, however, in that rather than accruing upon discovery of the injury, the statute of limitations begins to run when the defendant commits an act that injures the plaintiff. Higgins v. N.Y. Stock Exch., Inc., 942 F.2d 829, 832 (2d Cir. 1991) ("A cause of action for violation of the antitrust laws ordinarily accrues as soon as there is an injury to competition."); Zenith Radio Corp. v. Hazeltine Rsch., Inc., 401 U.S. 321, 338 (1971). Where, as here, there is an alleged continuing antitrust conspiracy, this has "been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." Higgins, 942 F.2d at 832 (quoting Zenith Radio, 401 U.S. at 338). But while "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, . . . . the commission of a 'separate new overt

act' will not permit the plaintiff to recover for the injury caused by old overt acts that do not fall within the limitations period." In re Nine W. Shoes Antitrust Litig., 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (quoting Klehr, 521 U.S. at 189). However, as with RICO claims, a court may still toll the running of an antitrust statute of limitations period based on the doctrine of fraudulent concealment. See New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988).

Plaintiffs' antitrust claims are also time-barred. First, I note that Plaintiffs' primary argument why their antitrust claims are not time-barred misunderstands the law. Plaintiffs argue that "[m]uch like . . . Plaintiffs' RICO claims . . . Plaintiffs did not have inquiry notice of their antitrust claims until June 2019." (Pls. Opp'n at 30-31.) But unlike RICO claims, the four-year antitrust statute of limitations begins to run when the defendant commits an act that injures the plaintiff, not upon the plaintiff's discovery of the injury. Higgins, 942 F.2d at 832; Zenith Radio, 401 U.S. at 338. Plaintiffs' Amended Complaint does not specify what alleged acts they consider to have been in furtherance of the antitrust conspiracy, as opposed to the RICO conspiracy. The main basis for their antitrust claims appears to be related to the collusive bidding at the 2004 and 2006 auctions. (See, e.g., Am. Compl. ¶ 674 (alleging as part of antitrust claim that "Defendants knowingly entered into a series of collusive agreements to reduce open and fair bidding by fixing and/or manipulating medallion prices at TLC auctions, so as to artificially inflate the value of said medallions").) Plaintiffs argue in their opposition that their antitrust claim encompasses more than the alleged 2004 and 2006 bid-rigging, saying the antitrust claims are predicated "both on the bid-rigging and the multitude of schemes to manipulate the medallion prices at TLC auctions." (Pls. Opp'n at 31.) But even putting aside the question of whether those acts could substantively constitute predicates for an antitrust conspiracy, all of those acts took place between 2004 and

2014, and therefore fall well outside of the four-year limitations period.[15] Thus, the statute of limitations has run.

As a result, Plaintiffs' antitrust claim can survive only if they can show that the statute of limitations should be tolled under the doctrine of fraudulent concealment. See Hendrickson Bros., 840 F.2d at 1083. An antitrust plaintiff seeking to toll a statute of limitations based on fraudulent concealment must show: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." Id. Plaintiffs fail to satisfy this standard. Even taking Plaintiffs at their word that "the antitrust claims are predicated both on the bid-rigging and the multitude of schemes to manipulate the medallion prices at TLC auctions," (Pls. Opp'n at 31), an undeniable core allegation is that collusion and bid-rigging occurred at the 2004 and 2006 auctions, (see Am. Compl. ¶¶ 15-19, 101-55, 674). Those allegations are based in large part on information that is entirely contained within the publicly available 2007 DOI report, which as already discussed was publicly released fourteen years prior to the commencement of this action and was covered in the mainstream press. Plaintiffs therefore have no basis to argue that the City Defendants "concealed from [them] the existence of [their] cause of action," or that their alleged "ignorance was not attributable to a lack of diligence on [their] part," where the essential anticompetitive acts were detailed at length in a report by the City's own Department of Investigation and documented in the media. See Hendrickson Bros., 840 F.2d at 1083. The availability of that significant evidence of

[15] The City Defendants also point out that as of March 21, 2017, the City ceased collecting a five percent transfer tax on medallion transfers, so even any activity related to the tax falls just outside the four-year limitations period. (See Defs. Mem. at 27 (citing N.Y.C. Loc. L. 58 of 2017).) I need not address this argument given that Plaintiffs do not contend that collection of the tax formed part of the anticompetitive conduct or was an act in furtherance of the antitrust conspiracy. (See Pls. Opp'n at 31-32 (listing conduct that Plaintiffs view as predicate acts for the antitrust claim); see also Am. Compl. ¶¶ 672-81 (Antitrust Cause of Action).)

collusion at the 2004 and 2006 auctions is alone sufficient to hold that any delay in Plaintiffs bringing their case is not the fault of fraudulent concealment by the City Defendants.

In sum, because Plaintiffs have brought their antitrust claim well after the expiration of the statute of limitations, and there is no basis to toll the limitations period under the doctrine of fraudulent concealment, their antitrust claim is likewise time-barred.

**C. Unjust Enrichment Claim**

Unjust enrichment claims under New York law are subject to a six-year statute of limitations. Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 518 (2d Cir. 2001); Cohen, 711 F.3d at 364. "Under New York law, the six-year limitations period for unjust enrichment accrues 'upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered.'" Cohen, 711 F.3d at 364 (quoting Coombs v. Jervier, 906 N.Y.S.2d 267, 269 (App. Div. 2010)).

First, Plaintiffs fail to respond in their opposition to the City Defendants' argument that the unjust enrichment claim is time-barred, so the issue is waived. See BYD Co. v. VICE Media LLC, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue." (citation omitted)), aff'd, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022). Second, Plaintiffs' unjust enrichment claim is untimely in any event. The underlying conduct for Plaintiffs' unjust enrichment claim is that "[a]s a direct result of Defendants' fraudulent scheme, Plaintiffs . . . were induced to purchase medallions from Defendants at inflated prices, both at TLC auctions and on the secondary market." (Am. Compl. ¶ 695.) As the City Defendants correctly point out, the latest that any Plaintiff is even alleged to have purchased a taxi medallion is April 2014, a full seven years before the filing of this lawsuit. (Id. ¶¶ 444-45 (alleging Plaintiff Roberts purchased three medallions in April

2014).) Indeed, the allegations detail many purchases that occurred decades prior. (Id. ¶¶ 433, 461 (alleging Plaintiff Roberts first purchased in the 1970s), ¶ 347 (alleging Plaintiff Kaminker purchased in 1992); ¶¶ 328-30 (alleging Plaintiff Soybel purchased in 2004).) And the $855 million that Plaintiffs seek to hold the City and TLC liable for on the unjust enrichment claim is based on "revenue from auctions and transfer taxes between 2004 and 2014." (See id. ¶¶ 55, 697.) For these reasons, Plaintiffs' unjust enrichment claims, like their RICO and antitrust claims, are time-barred.

**CONCLUSION**

For the reasons stated herein, the City Defendants' motion to dismiss is GRANTED, and Plaintiffs' claims are hereby dismissed as against the City Defendants.

SO ORDERED.

Dated: March 31, 2023
Brooklyn, New York

/s/ Carol Bagley Amon
Carol Bagley Amon
United States District Judge