# 25-667

*To Be Argued By:*
JOSEPH PACE

IN THE
# United States Court of Appeals
FOR THE
# Second Circuit

ALEC SOYBEL, GALINA KAMINKER,
STEVENE NEWMAN, ROB NEWMAN, GUY ROBERTS,
BORIS SHAPIRO, and SAVAS TSITIRIDIS,
*Plaintiffs-Appellants*

v.

THE CITY OF NEW YORK, NEW YORK CITY TAXI AND LIMOUSINE COMMISSION, MATTHEW W. DAUS, ESQ., DAVID YASSKY, MEERA JOSHI, ALAN FROMBERG, CHARLES FRASER, MICHAEL BLOOMBERG, EVGENY FREIDMAN, VLADIMIR BASIN, AND MAMED DZHANIYEV,
*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
No. 21-Civ-1846(CBA) (Amon, J.)

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

JON NORINSBERG
110 E. 59th Street, Suite 3200
New York, NY 10022
(212) 791-5396
jon@norinsberglaw.com

JOSEPH PACE
J. PACE LAW, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
(917) 336-3948
jpace@jpacelaw.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ i

STATEMENT OF JURISDICTION ........ 1

QUESTIONS PRESENTED ........ 1

STANDARDS OF REVIEW ........ 2

STATEMENT OF THE CASE ........ 3

I. Factual Background ........ 3

A. The Taxi Medallion Scheme ........ 4

B. City and State Investigations Expose the Fraud ........ 6

II. Procedural History ........ 8

SUMMARY OF THE ARGUMENT ........ 14

ARGUMENT ........ 18

I. THE DISTRICT COURT ERRED IN HOLDING THAT MUNICIPALITIES ARE IMMUNE FROM RICO'S TREBLE DAMAGES REMEDY ........ 18

A. The RICO Statute Expressly Authorizes Treble Damages Against Municipal Entities ........ 18

B. RICO's Treble Damages Remedy is Remedial, Not Punitive ........ 28

C. The District Court Misapplied *Cook County* ........ 33

D. Treble Damages Serve Public Policy Where, As Here, A Municipality Adopts an Official Policy to Generate Revenue Through Racketeering ........ 34

II. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' RICO DISGORGEMENT CLAIM ........ 38

A. Section 1964(a) Broadly Authorizes Courts to Order Disgorgement of All Ill-Gotten Gains ........ 36

i. *Porter*, *Mitchell*, and *AMG* Confirm That § 1064(a) Preserves the Courts' Full Discretion to Craft Disgorgement Remedies ........ 40


(Continued)

ii. Antitrust Laws, on Which Congress Modeled RICO, Confirm That § 1964(a) Authorizes Disgorgement to Remedy Past Wrongs ........ 48

iii. *United States v. Carson* is No Longer Good Law....... 50

B. The District Court's Finding That a Disgorgement Order Could Not "Prevent or Restrain" Future Violations by City Defendants Was in Error ........ 53

III. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ARE TIMELY ......... 61

CONCLUSION ........ 65

CERTIFICATE OF COMPLIANCE ........ 66

CERTIFICATE OF SERVICE ........ 67

ADDENDUM ........ 68

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*4 Pillar Dynasty L.L.C. v. N.Y. & Co.* ,
933 F.3d 202 (2d Cir. 2019) ........................................................ 56

*Abou-Khadra v. Mahshie*,
4 F.3d 1071 (2d Cir. 1993) .......................................................... 30

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.* ,
483 U.S. 143 (1987) ........................................................ 13,30,64

*Allaire Corp. v. Okumus*,
433 F.3d 248 (2d Cir. 2006) .......................................................... 3

*Am. Pipe & Constr. Co. v. Utah* ,
414 U.S. 538 (1974) ...................................................................... 9

*Am. Sur. Co. v. Marotta*,
287 U.S. 513 (1933) .................................................................... 54

*AMG Capital Mgmt., L.L.C. v. FTC*,
593 U.S. 67 (2021) ................................................................ 45,54

*Armstrong v. Guccione*,
470 F.3d 89 (2d Cir. 2006) ..................................................... 39,52

*Barnes v. Gorman*,
536 U.S. 181 (2002) .................................................................... 32

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) .................................................................... 48

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .................................................................... 28

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002) .......................................................... 3

*California v. Am. Stores Co., 495 U.S.*
(1990) .......................................................................... 44

*Casey v. Merck & Co.* ,
653 F.3d 95 (2d Cir. 2011) ............................................................ 3

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016) ........................................................ 52,54

*City of Chi. Heights v. LoBue*,
841 F. Supp. 819 (N.D. Ill. 1994) ................................................ 20

*Cohen v. S.A.C. Trading Corp.*,
711 F.3d 353 (2d Cir. 2013) .......................................................... 64

*Collins v. Vill. of Palatine*,
875 F.3d 839 (7th Cir. 2017) ........................................................ 63

*Commer. Cleaning Servs. v. Colin Serv. Sys.*,
271 F.3d 374 (2d Cir. 2001) .......................................................... 32

*Conboy v. AT&T Corp.*,
241 F.3d 242 (2d Cir. 2001) .......................................................... 52

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ..................................................................... 18

*Cook Cnty. v. United States ex rel. Chandler*,
538 U.S. 119 (2003) ............................................................ 12,19,36

*Cross v. N.Y. City Transit Auth.*,
417 F.3d 241 (2d Cir. 2005) ...................................................... 24,34

*Ehrenfeld v. Mahfouz*,
489 F.3d 542 (2d Cir. 2007) ............................................................ 3

*Fabrikant v. French*,
691 F.3d 193 (2d Cir. 2012) .......................................................... 62

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ..................................................................... 49

*FTC v. Bronson Partners, L.L.C.*,
654 F.3d 359 (2d Cir. 2011) .......................................................... 55

*Garth v. Cotton*,
27 Eng. Rep. 1182 (Ch. 1753) ...................................................... 51

*Genty v. RTC*,
937 F.2d 899 (3d Cir. 1991) .......................................................... 25

*Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*,
786 F.3d 400 (5th Cir. 2015) ........................................................ 25

*Gingras v. Think Fin., Inc.*,
922 F.3d 112 (2d Cir. 2019) ............................................. 11,22,23

*Goldberg v. Pace Univ.*,
88 F.4th 204 (2d Cir. 2023) .......................................................... 64

*Haldane v. Fisher*,
1 Yeates 121 (Pa. 1792) ................................................................ 51

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ....................................................................... 20

*Holmes v. Secs. Inv. Prot. Corp*,
503 U.S. 258 (1992) ....................................................................... 48

*Honda Motor Co. v. Oberg*,
512 U.S. 415 (1994) ....................................................................... 32

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019) ............................................................ 63

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
599 U.S. 382 (2023) ....................................................................... 21

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
940 F.2d 397 (9th Cir. 1991) .................................................. 25,35

*Law v. Siegel*,
571 U.S. 415 (2014) ........................................................... 21

*Lenzi v. Systemax, Inc.*,
944 F.3d 97 (2d Cir. 2019) ................................................. 62

*Liu v. SEC*,
140 S. Ct. 1936 (2020) ................................................... 39,51

*Loughrin v. United States*,
573 U.S. 351 (2014) ........................................................... 21

*Med. Marijuana, Inc. v. Horn*,
145 S. Ct. 931 (2025) ......................................................... 32

*Mitchell v. Robert De Mario Jewelry, Inc.*,
361 U.S. 288 (1960) ...................................................... *passim*

*Molzof v. United States*,
502 U.S. 301 (1992) ........................................................... 32

*Newport v. Fact Concerts*,
453 U.S. 247 (1981) ...................................................... *passim*

*PacifiCare Health Sys. v. Book*,
538 U.S. 401 (2003) ...................................................... *passim*

*Parker Drilling Mgmt. Servs. v. Newton*,
139 S. Ct. 1881 (2019) ....................................................... 44

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) ...................................................... *passim*

*Preterm-Cleveland v. McCloud*,
994 F.3d 512 (6th Cir. 2021) .............................................. 56

*Russello v. United States*,
464 U.S. 16 (1983) ............................................................. 22

*Safe Sts. All. v. Hickenlooper*,
859 F.3d 865 (10th Cir. 2017) ............................................ 31

*SEC v. Cavanagh*,
445 F.3d 105 (2d Cir. 2006) ............................................. 39,51,56

*SEC v. Fischbach Corp.*,
133 F.3d 170 (2d Cir. 1997) ..................................................... 57

*Sedima v. Imrex Co.*,
473 U.S. 479 (1985) ................................................... 22,30,54

*Shearson/American Express v. McMahon*,
482 U.S. 220 (1987) ............................................................ 29

*Shukla v. Sharma*,
586 F. App'x 752 (2d Cir. 2014) ............................................ 62

*Sniado v. Bank Aus. Ag*,
378 F.3d 210 (2d Cir. 2004) ..................................................... 3

*Sniado v. Bank of Austria AG*,
378 F.3d 210 (2d Cir. 2004) ..................................................... 62

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) ............................................................ 27

*Trump v. Deutsche Bank AG*,
943 F.3d 627 (2d Cir. 2019) ..................................................... 55

*United States v. Angelilli*,
660 F.2d 23 (2d Cir. 1981) ..................................................... 22

*United States v. Carson*,
52 F.3d 1173 (2d Cir. 1995) ............................................. *passim*

*United States v. Crescent Amuse. Co.*,
323 U.S. 173 (1944) ............................................................ 49

*United States v. Glaxo Grp., Ltd.*,
410 U.S. 52 (1973) .............................................................. 49

*United States v. Keyspan Corp.*,
763 F. Supp. 2d 633 (S.D.N.Y. 2011) ...................................... 50

*United States v. Lane Lab'ys-USA, Inc.*,
427 F.3d 219 (3d Cir. 2005) .................................................. 43,54

*United States v. Philip Morris USA, Inc.*,
396 F.3d 1190 (D.C. Cir. 2005) ............................................ 43,56

*United States v. Priv. Sanitation Indus. Ass'n*,
914 F. Supp. 895 (E.D.N.Y. 1996) ............................................... 58

*United States v. Rx Depot, Inc.*,
438 F.3d 1052 (10th Cir. 2006) ............................................ 43,54

*United States v. Sasso*,
215 F.3d 283 (2d Cir. 2000) ....................................................... 52

*United States v. Turkette*,
452 U.S. 576 (1981) ............................................................ 38,54

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ................................................................. 39

**Statutes**

Clayton Act, ch. 323, 38 Stat. 730,

15 U.S.C. § 4 ..................................................................... 48

15 U.S.C. § 15 ................................................................... 20

15 U.S.C. § 34 ................................................................... 20

15 U.S.C. § 35 ................................................................... 20

Emergency Price Control Act of 1942, ch. 26, 56 Stat. 23................ 41

Fair Labor Standards Act of 1938, 29 U.S.C. 201 *et seq* .................. 42

Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b) ......... 45-47

Organized Crime Control Act of 1970, Pub. L. No. 91-452,

84 Stat. 92333 ............................................................... 21,38

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961 *et seq.*,

18 U.S.C. § 1961 .......................................................................... 20

18 U.S.C. § 1962 ..................................................................... 13,19

18 U.S.C. § 1964 ..................................................................... *passim*

28 U.S.C. § 1291 .......................................................................... 2

28 U.S.C. § 1331 .......................................................................... 2

42 U.S.C. § 1983 ..................................................................... 25,26

**Other Sources**

Black's Law Dictionary, "Multiple damages" (7th ed. 1999) ............ 29

Preliminary Mayor's Management Report (PMMR) for Fiscal Year 2025, Dep't of Citywide Administrative Services, "Our Goals and Services"........................................................................................ 60

Einer Elhauge, *Antitrust Remedy*,
76 Antitrust L.J. 79 (2009) ........................................................ 49

Judith A. Morse, *Treble Damages Under RICO: Characterization and Computation*,
61 Notre Dame L. Rev. 526 (1986) .............................................. 29

NYC TLC, "Medallion Transfers" ...................................................... 59

NYC Dep't of Finance, "Department of Finance Extends Deadline for 2025 Tax Lien Sale" ........................................................................... 60

Restatement (Third) of Restitution & Unjust Enrichment (2011) .. 63

Tara Helfman*, Land Ownership and the Origins of Fiduciary Duty*,
41 Real Prop. Prob. & Tr. J. 651 (2006) ...................................... 51

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered final judgment dismissing the action on March 7, 2025, and Plaintiffs-Appellants filed a timely notice of appeal on March 21, 2025. JA15.

## QUESTIONS PRESENTED

1. Whether the District Court erred in finding that the City Defendants were immune from RICO treble damages.

2. Whether the District Court erred in finding that RICO's equitable provision, 18 U.S.C. § 1964(a), forecloses an award directing the City Defendants to disgorge profits illegally acquired through an officially-sanctioned scheme to defraud taxi medallion investors.

3. Whether *American Pipe* tolling renders Plaintiffs' unjust enrichment claims timely.

## STANDARDS OF REVIEW[1]

An order granting a Rule 12(b)(6) motion to dismiss is subject to *de novo* review, *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-250 (2d Cir. 2006), as are questions of statutory interpretation. *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir 2007). On appeal, all allegations in the complaint must be accepted as true and all inferences drawn in Plaintiffs' favor. *Allaire Corp.*, 433 F.3d at 249-250; *Caiola v. Citibank, N.A.*, 295 F.3d 312, 321 (2d Cir. 2002).

Typically, the availability of *American Pipe* tolling is likewise subject to *de novo* review. *Casey v. Merck & Co.*, 653 F.3d 95, 99 (2d Cir. 2011). However, because Plaintiffs did not raise the *American Pipe* tolling issue below with respect to the unjust enrichment claims, review is discretionary. *Sniado v. Bank Aus. Ag*, 378 F.3d 210, 213 (2d Cir. 2004) (court may consider waived argument "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding").

[1] Unless otherwise indicated, quotations throughout this brief have been cleaned up to omit internal quotation marks, citations, and alterations.

## STATEMENT OF THE CASE

### I. Factual Background

The instant lawsuit arises out of a well-publicized campaign by the City of New York ("the City") and the Taxi & Limousine Commission ("TLC"), in coordination with others,[2] to artificially inflate the value of taxi medallions to maximize City revenue. Relying on the TLC's representations that these medallions were a "a solid investment with steady growth" with a "return" that was "better than the stock market," JA32, thousands of medallion purchasers committed their entire life savings to these assets. As subsequent City and State law enforcement investigations would reveal, however, it was all a scam. Defendants knew for years that the medallion market was a "speculative bubble" and that it was on the brink of collapse. JA75. Yet, TLC concealed this truth from medallion purchasers until it was too late, all the while extracting millions of dollars from medallion transactions.

[2] The City and TLC are collectively referred to as "City Defendants." The Complaint also named several City officials ("Individual City Defendants") and private persons ("Freidman Defendants"), all of whom were dismissed from this action. The dismissal of the claims against the Individual City and Freidman Defendants is not being appealed.

A. The Taxi Medallion Scheme

The medallion scheme was initially devised in 2003 by Defendants Michael Bloomberg ("Bloomberg") and Chair and Chief Executive Officer of the TLC, Matthew Daus ("Daus"), as a politically expedient, "quick fix" to plug a hole in the budget deficit. JA39. Under this scheme, taxi medallions would be sold at TLC auctions with pre-determined price "floors"; the City would then collect a 5% transfer tax on the sale price at auction or on the secondary market. JA24, 40, 44. Realizing that tax revenues were directly proportional to the price and frequency of medallion sales, City and TLC officials devised what amounts to a four-part pump-and-dump scheme.

First, City Defendants artificially inflated the "upset price" (*i.e.*, the minimal sales price) for medallions at TLC auctions by setting a price prior to auction that they claimed was based on market conditions and tethered to the data provided by Department of Transportation and the Office of Management and Budget ("OMB"). In fact, the prices were fabricated. These misrepresentations caused medallion prices to skyrocket, from $200,000 in 2001 to more than $1,000,000 in early 2014. JA25, 40-41, 177.

Second, TLC facilitated and encouraged collusion among bidders to further inflate medallion values, and then accepted bids that it knew were the product of such illegal practices. JA26, 42-52. To take but one example: in the June 2006 auctions, the Freidman Defendants paid $477,666 for 18 medallions, which far exceeded the actual value of the medallions at the time. The City then accepted this bid, which caused the "floor price" for all future medallion transactions to soar to $477,666. JA44. The City Defendants then blocked anyone from selling medallions below this new "market value." JA44-45.

Third, TLC issued reports with falsified or misleading data exaggerating the average monthly sales prices for medallions. JA27. For example, the City published a report, titled "Sales-Average Prices & Numbers of Transfers," which purported to document all third-party medallion transactions; in fact, the report excluded any medallion transfers that were more than 10% below the average price from the previous month. JA27-28.

Fourth, to build demand, City Defendants launched a deceptive advertising campaign. JA31-32, 67-72. These advertisements proclaimed that medallion ownership represented "a solid investment with steady

growth," offering returns "better than the stock market" and promising a "worry-free retirement." JA32. The City Defendants knew these claims were false: the City's OMB was simultaneously forecasting steep declines in medallion values. The disconnect between the City Defendants' public representations and its internal projections was so stark that seven TLC staff members formally complained about the misleading advertisements. JA71.

In 2015, the speculative bubble that City Defendants created burst and the medallion market collapsed. JA74-76. At the final medallion auction in 2014, medallions commanded an average price of nearly $1.2 million. JA73. By November 2019, that average had plummeted to below $165,000. Today, medallions are effectively worthless. JA75.

B. <u>City and State Investigations Expose the Fraud</u>

Multiple investigations followed the collapse. These investigations revealed that the City had concealed a 2010 report (the "Roth Report") by a TLC policy analyst warning that medallion prices had "outstripped" their values. The investigations also uncovered that the City had been secretly developing plans to allow app-based services like Uber and Lyft to operate in New York City without purchasing medallions, knowing

this would devastate the medallion market. JA53-56. During a June 2019 City Council hearing on the medallion scheme, a councilman noted that the Roth Report "confirm[ed] that TLC and [the] city knew everything. TLC knew that there was speculation in the market by the likes of Gene Freidman, they knew that there was predatory lending in the medallion market, they knew that the market was at risk of collapse." JA29. That councilman described the "medallion market collapse" as "a cautionary tale of what happens when both government and markets are governed not by laws, but by greed." City leadership, he lamented, "was all too eager to kill a once golden asset for short term revenues. When it comes to the medallion market, money was indeed the root of all evil." JA78.

On February 20, 2020, Attorney General Letitia James filed a Notice of Claim, alleging that the City Defendants had "not only engaged in a scheme that defrauded medallion owners, but continued to further market these medallions at overvalued rates even after internal reports raised warnings about the inflated values." JA79. In a public statement, Attorney General James stated:

> Government should be a source of justice, not a vehicle for fraudulent practices. These taxi medallions were marketed as a pathway to the American Dream, but instead, became a trapdoor of despair for medallion owners harmed by the TLC's unlawful

> practices. The very government that was supposed to ensure fair practices in the marketplace engaged in a scheme that defrauded hundreds of medallion owners, leaving many with no choice but to work day and night to pay off their overpriced medallions. What's worse is that the TLC knew their actions were affecting some of the city's most financially exposed immigrant families. We are taking action to ensure New York's hard-working taxi drivers can be made whole again and are repaid the hundreds of millions the city unlawfully pocketed.

JA78, 167-69.

Notwithstanding the overwhelming evidence of fraud that her investigation had revealed, Attorney General James announced in February 2021 that she would not be proceeding with the lawsuit. JA79-80. Accordingly, Plaintiffs had no recourse but to seek justice on their own through the filing of this action.

## II. Procedural History

On April 6, 2021, seven named Plaintiffs commenced this lawsuit on behalf of anyone who bought, sold, or took out a loan against taxicab medallions "based on the artificially inflated market value for such medallions during the period between 2004 and 2017." Compl. Dkt. No. 1; Amended Compl., JA16-158. The Complaint asserted RICO, Sherman Act, and unjust enrichment claims against the City and TLC, several City officials who devised and supervised the scheme, and various private

parties who conspired with City Defendants to inflate medallion prices. On the RICO claims, Plaintiffs sought mandatory treble damages as per 18 U.S.C. § 1964(c), and rescission and disgorgement.

On March 11, 2022, City and Individual Defendants moved to dismiss the Complaint. As relevant here, these Defendants argued that news reports, lawsuits, and government investigations had put Plaintiffs on inquiry notice of the fraudulent scheme by 2015, and that the RICO and unjust enrichments claims were therefore time-barred. JA389-409. City Defendants also argued that municipalities enjoyed immunity from civil RICO liability. In opposition, Plaintiffs contested the inquiry notice assertions and argued that a 2017 complaint (the "*Singh* Class Action"), which brought fraud claims based on the medallion scheme, tolled the statute of limitations for the RICO claims. JA413-15 (citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)).

On March 31, 2023, the District Court granted the motion to dismiss. The court found that Plaintiffs' claims were "based on conduct that took place between seven and seventeen years prior to the filing of this lawsuit," that Plaintiffs' had inquiry notice, and that they failed to undertake a reasonable investigation. JA321-45, 351.The court also

found that *American Pipe* tolling only added nine months (not the required 15-16 months) to the limitation clock because the state court had dismissed the overlapping fraud claims in the *Singh* Class Action nine months after it was filed. JA346-47. Finally, the court found that Plaintiffs had waived their unjust enrichment claim by failing to separately defend its timeliness and that claim was "untimely in any event" for the same reasons as the RICO claims. JA351. The court did not reach the City Defendants' contention that they were immune from RICO's treble damages remedy.

On April 28, 2023, Plaintiffs moved for reconsideration of the *American Pipe* tolling issue, arguing that the tolling period ended not with the September 17, 2017 dismissal of the fraud-based claims, but on December 30, 2020, when the Appellate Division affirmed the denial of class certification. JA450-55. On March 13, 2024, the District Court granted the motion and reinstated Plaintiffs' RICO claims. However, the court narrowed the Complaint in three ways. First, it held that the RICO claims could proceed only against the City and TLC, as they were the sole defendants named in the *Singh* class action. Second, because the *Singh* Class Action's allegations were limited to the 2013-2014 auctions, the

court reinstated claims only for the named Plaintiffs who purchased medallions at those auctions: Shapiro, Tsitiridis, and Roberts (collectively, the "Remaining Plaintiffs").[3] Third, because *American Pipe* prohibits "follow-on" class actions after the statute of limitations expires, the court held that the Remaining Plaintiffs must proceed individually rather than as class representatives. JA362-64.[4]

After finding the RICO claims timely, the court turned to the City Defendants' contention that municipalities are immune from treble damages. The court identified two rationales that other courts have invoked to shield municipalities from civil RICO: first, "that government entities are incapable of forming the *mens rea* necessary to commit a RICO predicate act," and second, that it would violate public policy for taxpayers to "be made liable for extraordinary damages as a result of the actions of a few dishonest officials." JA368 (quoting *Gingras v. Think*

---

[3] This finding is not contested on appeal. For the sake of brevity, however, "Remaining Plaintiffs" will be referred to as "Plaintiffs" for the remainder of this brief.

[4] Plaintiffs' position is that *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018)—which forecloses the use of *American Pipe* tolling to bring successive class actions—was too expansive and that an exception to that rule should be made non-securities cases. Plaintiffs recognize, however, that this Court is bound by that decision and raise the matter solely to preserve the issue for further review.

*Fin., Inc.*, 922 F. 3d 112, 124-25 (2d Cir. 2019)). While acknowledging that *Gingras* rejected the *mens rea* rationale, the court concluded that the Second Circuit "conceived of RICO treble damages as, at least in part, punitive and viewed the public policy rationale as persuasive." JA370. The District Court reached this conclusion without citing any Second Circuit precedent that expressly or implicitly characterizes RICO treble damages as punitive or holds them unavailable against municipalities.

The District Court acknowledged that the Supreme Court had allowed treble damages remedies against municipalities under the False Claims Act ("FCA"). JA369-70 (citing *Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003)). However, the court found that *Cook County* was distinguishable because Congress had increased FCA damages from double to treble to "'strengthen[] the Government's hand in fighting false claims,'" and because FCA claims were unique in that they vindicated the rights of federal taxpayers. JA371 (quoting *Cook County*, 538 U.S. at 133-34).

The District Court also recognized that the Supreme Court had "'repeatedly acknowledged that the treble damages provision contained in RICO itself is remedial in nature,'" not punitive. JA369 (quoting

*PacifiCare Health Systems v. Book*, 538 U.S. 401, 406 (2003)). However, the court deemed *PacifiCare* inapposite because that case only addressed whether RICO treble-damages were "punitive" as that term was understood in an arbitration agreement—not whether they were "punitive" for purposes of deciding whether Congress "intended to override municipalities' longstanding common-law immunity for punitive damages." JA372. The District Court did not address or distinguish any of non-arbitration cases, cited in *PacifiCare*, in which the Supreme Court has characterized RICO treble damages as remedial. *See, e.g.*, *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987).

Having dismissed the treble-damages claims under § 1964(c) and found that the RICO statute contained no other basis for awarding compensatory damages, the court ordered the parties to brief the availability of equitable remedies. In response, Plaintiffs argued that they were entitled to an order of disgorgement under 18 U.S.C. § 1964(a), which vest courts with jurisdiction to issue "appropriate orders" to "prevent and restrain violations of section 1962 of [the RICO statute]."

On November 13, 2024, the District Court dismissed Plaintiffs' disgorgement claim and, by extension, the remaining claims against the

City Defendants. Relying on *United States v. Carson*, 52 F.3d 1173 (2d Cir. 1995), the court held that § 1964(a) only allowed for remedies that were "calculated to prevent future harm," JA383, and that disgorgement in this context would did not satisfy that criteria because the City officials responsible for the fraudulent scheme had left, no medallion auctions had taken place since 2014, and Plaintiffs had failed to allege any auctions "in the future that disgorgement might restrain." JA385. The court also rejected Plaintiffs' request for discovery into whether disgorgement might be justified on the grounds recognized in *Carson*. JA386.

On March 7, 2025, the District Court held that the claims against Private Defendants (who had not moved to dismissed) were barred by inquiry notice for the reasons set forth in the March 31, 2023 Order, and entered final judgment dismissing the action. This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court's holding that RICO's treble damages remedy is categorically unavailable against municipalities cannot be squared with the statute's text, structure, or purpose. When drafting the RICO statute, Congress provided for mandatory treble damages for any "person" who violates the Act and defined "person" to include municipalities. As the

Supreme Court held in *Cook County*, and as this Court's case law confirms, by crafting the statute thusly, Congress signaled an unmistakable intent that municipalities be subject to treble damages.

Rather than apply the statutory text as written, the District Court held that treble damages were punitive and therefore inapplicable to municipalities on public policy grounds. But it is axiomatic that, where Congress has authorized a remedy, courts cannot veto that remedy on public policy concerns. The court's conclusion that treble damages are "punitive," and therefore unavailable against municipalities, is also contrary to four decades of Supreme Court precedent describing RICO treble damages as remedial, and contrary to Congress's command that RICO's damages provisions be construed liberally. Finally, even if public policy *generally* counseled against the extension of RICO treble damages remedies to municipal defendants, it does not here. Where, as here, a municipal government implements an official scheme to illegally generate revenue for the benefit of taxpayers, public policy considerations demand that the municipality be held liable for damages. To hold otherwise would allow municipalities to defraud, with impunity, one group of taxpayers for the benefit of another.

The District Court also erred in dismissing Plaintiffs' disgorgement claim. The court reasoned that because § 1964(a) authorizes only orders that "prevent and restrain" RICO violations, and because the provision's examples are forward-looking, disgorgement is available only when it prevents future violations. The court then concluded that divesting the City of ill-gotten gains would be purely retrospective and therefore exceed § 1964(a)'s scope. Both of these suppositions are incorrect.

It is well-established that courts' equitable powers include the power to restore the status quo by ordering wrongdoers to divest themselves of ill-gotten gains acquired long ago. It is equally well-established courts retain that power unless Congress clearly and unmistakably withdraws it. Here, there is no evidence that Congress intended to eliminate courts' ability to craft backward-facing disgorgement remedies under § 1964(a). To the contrary, Congress legislated against the backdrop of Supreme Court decisions confirming that § 1964(a)'s "prevent and restrain" language preserved courts' full equitable powers, and Congress itself commanded that the § 1964(a) be construed maximally. To the extent this Court's decision in *United States*

*v. Carson* held otherwise, that decision is contrary to binding Supreme Court authority.

The District Court was equally mistaken in concluding that the disgorgement remedy sought here had no forward-looking effect. Both the Supreme Court and this Court have repeatedly recognized that disgorgement orders serve a vital forward-looking function by removing the profit incentive to engage in unlawful conduct. That rationale applies with special force here: the City Defendants retain the means, motive, and opportunity to inflate medallion prices to boost municipal revenues. Stripping them of the gains derived from past misconduct would reduce the likelihood of recurrence by eliminating the financial reward for fraud.

The combined force of the District Court's holdings on treble damages and disgorgement would be to render victims of municipal fraud without any remedy under the RICO statute. This is antithetical to Congress's intent that RICO be construed maximally and that it be used to stamp out government corruption.

Finally, the Court should reverse the lower court's finding that Plaintiffs' unjust enrichment claim was untimely. Although Plaintiffs did not separately defend the timeliness of that claim below, this Court may

exercise its discretion to consider legal arguments raised for the first time on appeal where they present pure questions of law. The timeliness of that claim hinges entirely on a legal issue—*i.e.,* the availability of *American Pipe* tolling—which the parties extensively litigated below in the context of the RICO claims. Because the tolling analysis is identical with respect to the unjust enrichment claim and because the timeliness of that claim is beyond dispute, this Court should exercise its discretion and reinstate that claim, notwithstanding the waiver.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN HOLDING THAT MUNICIPALITIES ARE IMMUNE FROM RICO'S TREBLE DAMAGES REMEDY

#### A. The RICO Statute Expressly Authorizes Treble Damages Against Municipalities

As the Supreme Court has "stated time and again[,] courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Where "the words of a statute are unambiguous, then, this first canon [that courts start with the text] is also the last: judicial inquiry is complete." *Id.* 254.

Here, the RICO statute unambiguously expresses Congress's intent to subject municipalities to treble damages: RICO declares that it shall be unlawful for "any person" to engage in certain racketeering activities, 18 U.S.C. § 1962, and provides that anyone who violates § 1962 is liable for mandatory treble damages. *Id.* § 1964(c).

It is well-settled that the term "person"—even when undefined in a statute—presumptively includes municipal entities, and that where Congress authorizes remedies against "any person," those remedies are presumptively available against municipal defendants. *See Cook County*, 538 U.S. at 126 (there has been "no doubt . . . that the statutory term 'person' extends as well to persons politic and incorporate, as to natural persons whatsoever"); *id.* at 127 (where municipal corporations are subject to statute's regulation, they, "like private ones, should be treated as natural persons for virtually all purposes of constitutional and statutory analysis."). Thus, in *Cook County*, the Court found that municipalities were "persons" subject to treble damages liability under the FCA, even though that statute left the term "person" undefined.

Here, by contrast, Congress did not simply rely on background presumptions: instead, it broadly defined "person" to include "any

individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3)—a definition that indisputably encompasses municipalities. *See, e.g.*, *City of Chi. Heights v. LoBue*, 841 F. Supp. 819, 822 (N.D. Ill. 1994) ("Common sense dictates that a municipal corporation may hold legal or beneficial interest in property, and thus may be a 'person' under this definition.").

This was no oversight. When Congress wishes to exempt municipalities from a damages remedy, it does so explicitly. Congress's approach to antitrust liability confirms as much: Congress modeled RICO § 1964(c) on § 4 of the Clayton Act, which likewise authorizes treble damages against any "person" who causes another to be "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a); *see Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 267-268, (1992) (noting that RICO treble damages remedy was patterned on Clayton Act). But Congress explicitly exempted municipal entities from the Clayton Act's damages regime. *See* 15 U.S.C. § 34(2) ("person" does not include "local government" entities for purposes of civil damages under the Clayton Act); *see also* 15 U.S.C. §§ 35(a) & 36 ("No damages, interest on damages, costs, or attorney's fees

may be recovered under section 4, 4A, or 4C of the Clayton Act . . . from any local government, or official or employee thereof acting in an official capacity.").

RICO contains no such carveout, and the courts may not rewrite the statute to import exemptions that Congress chose not to include. *See, e.g., Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 392 (2023) (declining to read tribal "carve out" into statute because "[t]here is no indication that Congress meant to categorically exclude certain governments from these provisions' enforcement mechanisms and exceptions"); *cf. Law v. Siegel*, 571 U.S. 415, 424 (2014) (declining to read into the Code an exception Congress did not include in its "meticulous" and "carefully calibrated" scheme).

The legislative history confirms that Congress "said what it meant and meant what it said" when defining the reach of the treble damages remedy. *Loughrin v. United States*, 573 U.S. 351, 360 (2014). Congress specifically directed in RICO's text that the statute "be liberally construed to effectuate its remedial purposes," Pub. L. 91-452, § 904(a), 84 Stat. 947, and the Supreme Court has emphasized that this "liberal-construction mandate" applies with particular force to interpretations of

"§ 1964, where RICO's remedial purposes are most evident." g*Sedima v. Imrex Co.*, 473 U.S. 479, 492 n.10 (1985); *Russello v. United States*, 464 U.S. 16, 26 (1983) (Congress enacted RICO to "provide new weapons of unprecedented scope" to attack the "economic roots" of the targeted activity). That same history makes clear that municipal entities were meant to be included within RICO's reach. As this Court recognized long ago: "the purpose and history of the Act and the substance of RICO's provisions demonstrate a clear congressional intent that RICO be interpreted to apply to activities that corrupt public or governmental entities." *United States v. Angelilli*, 660 F.2d 23 (2d Cir. 1981).

The District Court's holding that municipalities are exempted from § 1964(c) claims was based on a misreading of this Court's case law. The District Court interpreted *Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019), as embracing the view that RICO treble damages were punitive and, therefore, contrary to public policy. JA370. But *Gingras* expressed no view whatsoever about the availability of RICO treble damages against municipalities. The question in *Gingras* was whether a civil plaintiff could seek injunctive relief against a tribal defendant. The Court noted that *other courts* had articulated two different rationales for

excluding municipalities from RICO's reach: (1) that municipal corporations cannot form the *mens rea* required to commit a RICO predicate act; and (2) that requiring taxpayers to pay punitive damages "as a result of the actions of a few dishonest officials'" would "offend public policy." 922 F.3d at 125. *Gingras* rejected the first rationale out of hand and held that the second rationale was not implicated because the plaintiffs only sought injunctive relief. *Id.* Not even in *dicta* did this Court express sympathy for the latter rationale.

Nor does public policy furnish a basis for excluding municipalities from § 1964(c)'s reach. Even if RICO treble damages were punitive (and for reasons explained below, they are not), that would not immunize municipalities from their reach. As *Cook County* made clear, where Congress uses a term—like "person"—that encompasses municipalities and specifies damages remedies, the "punitive feature" of a specified remedy will not displace the presumption that Congress intended for that remedy to extend to municipalities. *See* 538 U.S. at 130 ("[I]t does not follow that the punitive feature has the force to show congressional intent to repeal implicitly the existing definition of ['person'], which included municipalities.").

This Court's decision in *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241 (2d Cir. 2005), confirms that point. *Cross* considered whether municipalities could be liable for liquidated damages under the ADEA. This Court acknowledged that both it and the Supreme Court had held that "Congress intended for [the ADEA's] liquidated damages to be punitive in nature," 417 F.3d at 255 (citing cases), and that it was "bound" by that determination. *Id.* However, the controlling question, the Court held, was not whether liquidated damages were punitive or remedial but whether Congress had "expressly authorize[d]" such damages against government employers. *Id.* The Court held that Congress had, in fact, expressly authorized this form of punitive damages by defining "employer" to include municipal entities and by authorizing liquidated damages against any "employer" who committed an ADEA violation. *Id.* at 255-57 (citing *Cook County*); *id.* at 256 ("the language of [the ADEA's] integrated statutory scheme, read as a whole, 'makes it clear that Congress intended to subject municipalities . . . to the liquidated damages provision of the ADEA") (quoting *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 373 (3d Cir. 2004).

To be sure, several other circuits have held that Congress intended to immunize municipalities from RICO treble damages. *See Genty v. Resolution Trust Corp*, 937 F.2d 899, 910 (3d Cir. 1991); *Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 413 (5th Cir. 2015); *Lancaster Community Hospital v. Antelope Valley Hospital District*, 940 F.2d 397, 404 (9th Cir. 1991). Those decisions, however, were incorrectly reasoned and are non-viable in light of *Cook County*.[5] Each of those decisions relied on *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), which held that municipalities are presumptively immune from punitive damages in the absence of express congressional authorization. *Fact Concerts*, however, is inapposite—*even if* one assumes, *arguendo*, that RICO treble damages are punitive.

*Fact Concerts* addressed the availability of punitive damages under 42 U.S.C. § 1983. Like RICO, § 1983 regulates "persons"; but, unlike

[5] It goes without saying that these opinions are not binding. *See Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("[U]ntil the Supreme Court speaks, the federal circuit courts are under duties to arrive at their own determinations of the merits of federal questions presented to them."); *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175 (D.C. Cir. 1987) ("[I]f a federal court simply accepts the interpretation of another circuit without [independently] addressing the merits, it is not doing its job.").

RICO, § 1983 fails to specify any remedies whatsoever.[6] Faced with that silence, the Court consulted common law principles as they existed in 1871 to determine what damages Congress intended to authorize. The Court noted that, while it was generally understood in 1871 that "a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity, . . . this understanding did not extend to the award of punitive or exemplary damages." 453 U.S. at 259-60. "[T]he general rule," the Court reasoned, is "that no punitive damages are allowed unless expressly authorized by statute." *Id.* at 262 n.21. Because §1983 did not specify a punitive damages award and because there was no evidence that Congress intended to disturb the "settled common-law immunity" that municipalities enjoyed from punitive damages, the Court held punitive damages were unavailable under § 1983. *Id.* at 266-71.

That holding offers no support for the notion that Congress intended to exempt municipalities from the treble damages regime set

[6] Section 1983 provides, in relevant part, that "every person" who acts under color of law to deprive others of constitutional or federal rights "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

forth in § 1964(c). Read in tandem, *Fact Concerts* and *Cook County* confirm that where a statute is silent on remedies, courts apply common-law presumptions—including presumptive municipal immunity from punitive damages. But where Congress expressly mandates specific damages against any "person" who violates the statute and defines "person" broadly enough to encompass municipalities, that command must be given effect. RICO does precisely that: it offers the broadest possible construction of "person" and mandates treble damages for violations.

Unlike the remedial vacuum in § 1983, RICO leaves no room for importing common-law immunities that would contradict the statute's express terms. Nor may courts invoke public policy to circumvent the RICO statute's clear mandate. Indeed, whether it is good public policy to subject municipalities to treble damages is irrelevant to the Court's task. As the Supreme Court has repeatedly instructed, "appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). "When the express terms of a statute give us one answer and extratextual considerations suggest

another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cty.*, 590 U.S. 644, 653 (2020).

### B. RICO's Treble Damages Remedy is Remedial, Not Punitive

As explained above, every court to find municipalities exempt from RICO treble damages has relied on *Fact Concerts*' holding that municipalities retain their immunity from punitive damages absent explicit abrogation by Congress. But the core premise—that treble damages are "punitive" for purposes of assessing immunity from suit—is contrary to *Cook County* and forty years of Supreme Court case law holding that RICO treble damages are remedial in nature.

In *Cook County*, too, the county defendant invoked *Fact Concerts* in support of its argument that the FCA's treble damages remedy was sufficiently punitive to trigger the common law presumption against extending that remedy to municipalities. 538 U.S. at 130. As already mentioned, the Court first rejected that argument on the grounds that the FCA's use of "person" and specification of treble damages flipped the presumption in favor of municipal liability. But the Court separately rejected the county's argument because FCA "treble damages have a

compensatory side, serving remedial purposes in addition to punitive objectives." *Id.* The same is true of RICO treble damages.

The Supreme Court has "repeatedly acknowledged that the treble-damages provision contained in RICO itself is remedial in nature."[7] *PacifiCare*, 538 U.S. at 406; *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 240-42 (1987) (noting that the legislative history of § 1964(c) reveals an "emphasis on the remedial role of the treble damages provision" and that its "compensatory function" takes "priority . . . over its deterrent function"); *see also* S. Rep. No. 91-617, at 81-82 (1969) (stating that RICO was not intended "to visit punishment on any individual; the purpose is civil. Punishment as such is limited to the criminal remedies"); Judith A. Morse, *Treble Damages Under RICO: Characterization and Computation*, 61 Notre Dame L. Rev. 526, 547

---

[7] That Congress would describe treble damages as remedial, not punitive, should come as no surprise. The term "punitive damages" is a familiar term that describes a category of common-law, discretionary damages independently awarded to punish a defendant for culpable conduct. *See Molzof v. United States*, 502 U.S. 301, 306 (1992) ("'Punitive damages' is a legal term of art that has a widely accepted common-law meaning."). Multiple damages regimes, however, have long been understood as serving non-punitive functions. *See, e.g.*, Black's Law Dictionary, "Multiple damages" (7th ed. 1999) (citing Dan B. Dobbs, Law of Remedies § 3.12, at 359 (2d ed. 1993)) ("Multiple damages statutes may be enacted for entirely non-punitive purposes.").

(1986) ("Congress intended treble damages not as a means for punishing the defendant, but as a remedy for the plaintiff.").[8]

Indeed, virtually every factor underlying *Cook County*'s conclusion that FCA treble damages are remedial for municipal immunity purposes applies equally to § 1964(c). Thus, *Cook County* observed that the FCA's treble damages provision was designed not merely to punish, but to "quicken the self-interest of some private plaintiff" to bring FCA claims. 538 U.S. at 131. RICO's treble damages regime serves the same function. *See Malley-Duff*, 483 U.S. at 151 (describing the "carrot of treble damages" as a mechanism to encourage "private attorneys general" to enforce RICO); *accord Sedima*, 473 U.S. at 493. *Cook County* also noted that the FCA lacks "a separate provision for prejudgment interest, which is usually thought essential to compensation." 538 U.S. at 131. The same is true for RICO. *Abou-Khadra v. Mahshie*, 4 F.3d 1071, 1084 (2d Cir.

---

[8] Further confirming RICO damages' remedial nature, the Supreme Court has oft noted that Congress modeled § 1964(c) directly on the Clayton Act's treble damages provision, and that the latter provision is remedial rather than punitive. *See, e.g.*, *McMahon*, 482 U.S. at 241; *Malley–Duff & Associates, Inc.*, 483 U.S. at 151; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485-86 (1977).

1993) ("[T]he RICO statute does not contain any provisions concerning the award of prejudgment interest.").

*Cook County* also explained that FCA treble damages do not raise the same policy concerns as "classic punitive damages." 538 U.S. at 131-32. A paramount concern with awarding punitive damages against municipalities, the Court explained, is that an "unduly generous jury," cognizant of a municipality's deep pockets and taxing power, will be tempted to use their "open-ended discretion over the [punitive] amount" and issue excessive awards. *Id.* at 132; *Fact Concerts*, 453 U.S. at 270 ("[B]ecause evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded, the unlimited taxing power of a municipality may have a prejudicial impact on the jury"). That risk, *Cook County* reasoned, is not present in the FCA context because the jury's role is limited to determining actual damages, after which "the court alone then determines any multiplier." 538 U.S. at 132. Again, the same is true under RICO. Where a violation is found, the jury may only assess actual damages, proximately caused to the plaintiff's "business or property" by reason of the RICO violation. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 888–89 (10th Cir. 2017)

(RICO does not permit recovery for "emotional, personal, or speculative future injuries"); *Commer. Cleaning Servs. v. Colin Serv. Sys.*, 271 F.3d 374, 380 (2d Cir. 2001) (emphasizing the limiting effect of the proximate cause requirement); *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 945 (2025) ("[N]ot every monetary harm—be it lost wages, medical expenses, or otherwise—necessarily implicates RICO."). And once liability is found and actual damages determined, the trebling occurs by operation of statute, not by jurors' discretion.

In short, there are sundry public policy reasons to be cautious about extending punitive damages remedies to municipal defendants. Punitive damages "leave the jury with wide discretion in choosing amounts[.]" *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994). Their determination is based on subjective measures—like a defendant's wealth or "the degree of the defendant's culpability"—into which bias can creep. *Molzof*, 502 U.S. at 306-07. And the amounts are "untethered to compensable harm." *Barnes v. Gorman*, 536 U.S. 181, 191 (2002) (Souter, J., concurring). *None*

of these concerns, however, are present in the context of RICO treble damages.[9]

### C. The District Court Misapplied *Cook County*

Rather than apply *Cook County*'s controlling framework, the District Court attempted to distinguish it on two grounds, neither of which withstand scrutiny.

First, the court noted that when Congress increased FCA damages from double to treble in 1986, courts had already held that the FCA extended to municipalities. By contrast, the District Court observed, no court had previously subjected municipalities to RICO damages. JA371. This distinction, however, fundamentally misreads *Cook County*. The Supreme Court's holding did not turn on prior judicial interpretations of the FCA, but on bedrock principles of statutory construction (*i.e.*, that "person" presumptively includes municipalities) and the conclusion that

[9] *See also Inv. Partners, L.P. v. Glamour Shots Licensing, Inc.*, 298 F.3d 314, 317 (5th Cir. 2002) ("That is, punitive damages are awarded under notoriously open-ended legal standards and a broadly defined constitutional limit concerning the amount awarded. Treble damages, however, represent a mere mathematical expansion of the actual damages calculated by the arbitrator.").

treble damages are not "punitive" as that term was meant in *Fact Concerts*.

Second, the District Court held that *Cook County* was inapplicable because FCA recoveries return fraudulently obtained funds to the federal treasury, whereas RICO damages awards benefit only private plaintiffs. JA371. This distinction fails on multiple levels. To start, *Cook County* listed this not as a dispositive factor, but as one consideration among many. Indeed, the Court's analysis turned principally on the statutory text and the FCA's remedial features, not on the identity of the recovery's ultimate beneficiary. Moreover, *Cross*—which permitted a private ADEA plaintiff to obtain punitive damages from a government employer—forecloses the argument that treble damages are available only where taxpayers generally benefit from the award. *See* 417 F.3d 241.

### D. Treble Damages Serve Public Policy Where, As Here, A Municipality Adopts an Official Policy to Generate Revenue Through Racketeering

Even if this Court found that the RICO statute failed to expressly authorize treble damages *and* that treble damages were punitive, that would not foreclose them in this case. As *Fact Concerts* shows, public policy may, in limited circumstances, mandate the imposition of such a

remedy. *See* 453 U.S. at 266 ("Finding no evidence that Congress intended to disturb the settled common-law immunity, we now must determine whether considerations of public policy dictate a contrary result."). In that case, the Court "examine[d] the objectives underlying punitive damages in general, and their relationship to the goals of § 1983" and concluded that public policy counseled against authorizing punitive damages under that statute. *Id.* at 266. But that analysis is inverted where, as here, the violation is an official municipal policy designed to enrich the city treasury.

First, *Fact Concerts* explained that punitive damages "'punish[]' only the taxpayers, who took no part in the commission of the tort." *Id.* at 267. This is especially problematic where taxpayers are being asked foot the bill for the wayward conduct of "a few dishonest officials." *Lancaster Community Hospital*, 940 F.2d at 404-05. That, however, is not the case here: the fraudulent scheme in this case, was not implemented by a few dishonest officials for personal gain; instead, it was crafted, executed, and overseen by the highest echelons of City government—including the Mayor, TLC Chairs, and TLC Deputy Commission for Public Affairs—for the express purpose of generating City revenue *for the*

*taxpayer's benefit*. JA33, 36-37, 132-39, 141-42. Indeed, the Individual Defendants admitted as much in connection with their argument below that they could not be liable because their "alleged wrongful actions . . . clearly reflect the performance of their duties and responsibilities as officials and employees of the City." Dkt. No. 55 at PageID#1469-70. When a municipality commits criminal acts to fill its coffers, taxpayers are not innocent bystanders but beneficiaries. As in the FCA context, treble damages in such circumstances fall on "local taxpayers who have already enjoyed the indirect benefit of the fraud" through "lower taxes or expanded services." *Cook County*, 538 U.S. at 132. Having already reaped the rewards of the City's racketeering, taxpayers should not be shielded from its consequences.

Second, *Fact Concerts* reasoned that the deterrence rationale was inapplicable in the § 1983 context because officials were unlikely to be deterred by awards that came out of municipal coffers. 453 U.S. at 268-69. But where, as here, the purpose of the illegal scheme is to enrich the treasury, the best deterrent is a remedy that strikes at the treasury itself. Under these circumstances, imposing treble damages serves rather than

offends public policy by deterring municipalities from sanctioning unlawful enterprises that rob one class of taxpayers to generate revenue.

Finally, *Fact Concerts* reasoned that punitive damages against a municipality were unnecessary because § 1983 ensures that a plaintiff will be "fully compensated" through compensatory damages. 453 U.S. at 267. Not so with RICO. Because the civil RICO statute does not provide for non-multiplied compensatory damages, a finding that treble damages are unavailable necessarily means that victims of municipal RICO violations are without any remedy at law.[10] Such a result would contravene the plain text of the statute, frustrate Congress's purposes in enacting RICO, and—particularly in a case like this—violate public policy.

---

[10] It is no answer to point out that a private RICO plaintiff may seek injunctive relief against a municipality. *See Gingras*, 922 F.3d at 120. Because attorneys' fees are not available to plaintiffs who only secure injunctive relief, *Aetna Casualty & Surety Co. v. Liebowitz*, 730 F.2d 905, 907-09 (2d Cir. 1984), many private litigants will face insurmountable financial barriers to pursuing this form of relief. *Cf. Ne. Women's Ctr. v. McMonagle*, 889 F.2d 466, 474 (3d Cir. 1989) (Congress understood that attorneys' fees were necessary "encourage private litigants to promote the policies underlying the substantive legislation").

## II. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' RICO DISGORGEMENT CLAIM

Congress enacted RICO to provide "'new remedies to deal with the unlawful activities of those engaged in organized crime.'" *United States v. Turkette*, 452 U.S. 576, 589 (1981) (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 923). To that end, Congress vested district courts with equitable jurisdiction to issue "appropriate orders" to "prevent and restrain" violations of RICO. 18 U.S.C. § 1964(a). One of the principal functions of equitable relief under RICO "is to divest the association of the fruits of its ill-gotten gains." *Turkette*, 452 U.S. at 585.

Despite Congress's broad mandate, the District Court held that it lacked authority under § 1964(a) to order City Defendants to disgorge revenue obtained through the fraudulent medallion scheme. The court based this conclusion on two premises: first, that § 1964(a) limits equitable remedies to those that are "forward-looking and intended to address future conduct," and second, that disgorgement here would serve no forward-looking purpose. JA381-85. Both premises are flawed.

### A. Section 1964(a) Broadly Authorizes Courts to Order Disgorgement Of All Ill-Gotten Gains

The District Court's authority to order disgorgement here flows from two principles. First, "[e]quity practice [has] long authorized courts to strip wrongdoers of their ill-gotten gains." *See Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020); *SEC v. Cavanagh*, 445 F.3d 105, 120 (2d Cir. 2006). Second, courts retain their full range of equitable powers absent a "clear indication of legislative intent" to "displace or repudiate" those powers. *Armstrong v. Guccione*, 470 F.3d 89, 102 (2d Cir. 2006); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Evidence of Congress's intent to constrain courts' equitable authority must be unequivocal; thus, "ambiguities in the statute . . . [must be resolved] in favor of that interpretation which affords a full opportunity for courts to act in accordance with their traditional practices." *Guccione*, 470 F.3d at 102 (cleaned up) (citing cases).

Here, there is no evidence—much less clear and unambiguous evidence—that Congress intended to limit courts' disgorgement powers under § 1964(a) to forward-facing remedies. Indeed, the text, legislative history, and case law confirm that Congress intended the opposite.

i. *Porter*, *Mitchell*, and *AMG* Confirm That § 1964(a) Preserves Courts' Full Discretion to Craft Disgorgement Remedies

When Congress enacted RICO in 1970, it legislated against the backdrop of *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), and *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960). Those decisions establish that "[w]hen Congress entrusts to an equity court the enforcement of [statutory] prohibitions," it invokes "the historic power of equity to provide complete relief." *Mitchell*, 361 U.S. at 291-292. Under such a statute, "all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction," in the absence of "a clear and valid legislative command" limiting the "comprehensiveness" of such authority. *Id.* at 291 (quoting *Porter*, 328 U.S. 398). The "full scope" of "the court's jurisdiction in equity" must therefore "be recognized and applied" "[u]nless a statute *in so many words, or by a necessary and inescapable inference*," restricts that authority. *Id.* (quoting *Porter*, 328 U.S. 398) (emphasis added).

*Porter* and *Mitchell* applied these principles to statutory language materially indistinguishable from § 1964(a)'s "prevent and restrain" formulation and concluded that such language preserves rather than restricts courts' traditional disgorgement powers.

In *Porter*, the Court applied those principles to a provision of the Emergency Price Control Act ("EPCA"), which authorized the government to apply to an appropriate court for "'an order enjoining [prohibited] acts or practices'" or "'enforcing compliance'" with the Act, and provided that if a violation was established, "'a permanent or temporary injunction, restraining order, or other order shall be granted.'" 328 U.S. at 397 (quoting EPCA § 205(a)). The Court construed this provision to authorize a court to issue a "decree compelling [a landlord defendant] to disgorge profits . . . acquired in violation of [the ECPA's price controls]." *Id.* at 398-399. It is "readily apparent," the Court reasoned, "that a decree compelling one to disgorge profits, rents or property acquired in violation of [the law] may properly be entered by the District Court once its equity jurisdiction has been invoked." *Id.* at 398-399. Significantly, *Porter* recognized two separate rationales for disgorgement. The first was preventative and forward-looking. *Id.* at 400 ("Future compliance may be more definitely assured if one is compelled to restore one's illegal gains."). The second, however, was restorative and backward-looking. *Id.* at 402 (an order compelling a violator "to restore [his] illegal gains" falls "within the recognized power and within the

highest tradition of a court of equity" to "act in the public interest by restoring the status quo").

*Mitchell* reaffirmed *Porter*'s broad conception of federal equity jurisdiction, and held in the context of suits to enforce the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201 *et seq.*, that district courts may redress the effects of past statutory violations through appropriate equitable decrees. Specifically, the Court held a provision of the FLSA authorizing courts to "restrain violations" invoked "the historic power of equity to provide complete relief" and included the power "to order reimbursement for loss of wages caused by [a retaliatory] discharge" of employees in violation of the FLSA. 361 U.S. at 289, 291-292.

*Porter* and *Mitchell* directly govern the interpretation of § 1964(a). The grant of authority to "prevent" violations of RICO is materially indistinguishable from the statutory authority in *Porter* to issue orders "enjoining" ECPA violations—language which permitted courts to order a landlord to "disgorge profits" flowing from ECPA violations.[11] *Porter*,

[11] The *Mitchell* majority rejected the dissent's contention that *Porter*'s holding turned on the language in the EPCA authorizing courts to issue any "other order." *See id.* at 298-99, n.1 (Whittaker, J., dissenting).

328 U.S. 398-399.[12] And § 1964(a)'s grant of authority to "prevent *and* restrain violations" of RICO is more expansive than the "restrain violations" language that *Mitchell* interpreted as conferring the power to "provide complete relief" for past FLSA violations. 361 U.S. at 289, 291-292. *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1219 (D.C. Cir. 2005) (Tatel, J., dissenting) ("If [the FLSA] language opens the door to all equitable relief, then RICO's [broader] language . . . certainly does the same.").

*Porter* and *Mitchell* also squarely foreclose the contention that a grant of authority to "restrain violations" signifies Congress's intent to cabin courts to forward-facing equitable remedies. *See, e.g.*, *United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1058 (10th Cir. 2006) (holding that § 332(a) of the Food, Drug, and Cosmetic Act—which confers on courts "jurisdiction, for cause shown to restrain violations of [the FDCA]"—authorizes courts to order backward-looking disgorgement remedies); *accord United States v. Lane Labs-USA, Inc.*, 427 F.3d 219, 235 (3d Cir.

---

[12] Like the RICO statute, the EPCA provided for a comprehensive remedial structure, including criminal remedies, EPCA, § 205(b)-(c), 56 Stat. 23, 33 (1942), private causes of actions, and treble damages. *Id.* § 205(e), 56 Stat. at 34.

2005) (argument that "'prevent and restrain' contemplates only forward-looking remedies" was "considered and rejected by the Supreme Court in *Porter* and *Mitchell*").

*Porter* and *Mitchell*'s importance cannot be overstated. The Congress that enacted § 1964(a) in 1970 is presumed to have acted with these decisions' broad view of equitable authority in mind. Indeed, the bedrock principle of statutory interpretation that "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019), carries particular force with respect to the crafting of equitable remedies. *See Weinberger*, 456 U.S. at 313 (because the pursuit of equitable relief "reflect[s] a practice with a background of several hundred years of history" as to which "Congress is assuredly well aware, . . . we do not lightly assume that Congress had intended to depart from established principles") (citing *Porter*); *California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990) ("when Congress endows the federal courts with equitable jurisdiction, Congress acts aware of th[e] longstanding tradition of flexibility") (citing *Porter*).[13]

[13] The legislative history confirms that Congress was aware of these principles. When introducing the bill, RICO's senate sponsor stated: the "ability of our chancery courts to formulate a remedy to fit the wrong is

The District Court brushed aside *Porter* and *Mitchell*, citing the Supreme Court's recent observation that those cases did not "'purport to set forth a universal rule of interpretation.'" JA383 (quoting *AMG Capital Mgmt., LLC, v. FTC*, 593 U.S. 67, 79 (2021)). That observation, however, merely reiterated that courts must examine each statute on its own terms to determine whether Congress intended to limit courts' equitable authority. And, crucially, *AMG*'s analysis of the statute before it *reinforces* the conclusion that Congress intended § 1964(a) to preserve, not restrict, courts' equitable powers.

The question in *AMG* was whether § 13(b) of the Federal Trade Commission Act ("FTCA")—which authorizes the Commission to obtain a "permanent injunction"—empowers courts to order disgorgement. *Id.* at 70. The Court began by noting that § 13(b)'s sole reference to "permanent injunctions" was "not enough" to resolve that question because the Court had historically interpreted "similar language as authorizing judges to order equitable monetary relief." *Id.* at 75 (citing

---

one of the greatest benefits of our system of justice. This ability is not hindered by the bill." 115 Cong. Rec. 9567 (1969); *see also Cavanagh*, 445 F.3d at 117-21 (recognizing that chancery courts had broad discretion to craft backward-facing disgorgement remedies).

*Porter* and *Mitchell*). The Court held that, to ascertain Congress's intent, it had to look beyond the "permanent injunction" language and consider the FTCA's "language and structure . . . as a whole." *Id. AMG* thus confirmed *Porter* and *Mitchell*'s vitality and reaffirmed the principle that "restrain violations" language is not, in itself, evidence that Congress intended to cabin courts' equity powers.

The *AMG* Court then identified three features of the FTCA that, "*taken together*," established Congress's intent to exclude monetary relief under § 13(b). *Id.* (emphasis added). None of these features, however, are present in the RICO statute.

First, the Court noted that § 13(b) was "buried" in a provision that "focuses upon relief that is prospective, not retrospective." *Id.* at 75-76. Thus, § 13(b) requires a showing that a person "'is violating' and 'is about to violate' (not 'has violated')" the FTCA, *id.* at 76 (quoting 15 U.S.C. § 53(b)); the provision also provides that the Commission may seek an order "enjoining" the ongoing or prospective violation "pending the issuance of a complaint by the Commission." *Id.* This language, the Court concluded, shows that the purpose of § 13(b) was to "stop[] seemingly unfair practices from taking place while the Commission determines

their lawfulness." *Id.* at 76. Section 1964(a), by contrast, does not condition equitable relief on a current or imminent RICO violation, nor does it contain any language suggesting that its purpose is limited to halting potential RICO violations while their lawfulness is adjudicated.

Second, the Court observed that other provisions of the FTCA already explicitly authorized disgorgement. 593 U.S. at 77 (citing 15 U.S.C. § 45(l) (authorizing courts to issue "other and further equitable relief"); 15 U. S. C. § 57b(b) (authorizing an order directing the "refund of money or return of property"). The civil RICO statute, by contrast, contains no other provision for disgorgement; thus, interpreting § 1964(a) as authorizing that relief would not create the statutory redundancies *AMG* sought to avoid.

Third, the Court held that permitting disgorgement under § 13(b) would allow the Commission to circumvent the substantive and procedural safeguards that Congress had recently added to FTCA actions seeking monetary damages. *Id.* at 77-78. The Court found it "highly unlikely" that Congress would simultaneously strengthen those safeguards while permitting the Commission to bypass them through

§ 13(b)'s more permissive process. *Id.* at 77-78. Again, that concern is absent in the RICO context.

ii. Antitrust Laws, on Which Congress Modelled RICO, Confirm That § 1964(a) Authorizes Disgorgement to Remedy Past Wrongs

Antitrust law further confirms that Congress intended § 1964(a) to preserve, not curtail, equity courts' inherent authority to craft disgorgement remedies. *See Holmes v Securities Investor Protection Corp*, 503 US 258, 267 (1992) (noting that Congress patterned RICO on the antitrust laws). The Sherman Act, like RICO, vests courts with "jurisdiction to prevent and restrain violations," 15 U.S.C. § 4, and it is universally understood that Congress intended to authorize disgorgement for antitrust violations. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 473 n.10 (1982) ("Only by requiring violators to disgorge the 'fruits of their illegality' can the deterrent objectives of the antitrust laws be fully served."); *see also* Phillip E. Areeda *et al.*, Antitrust Law ¶ 325a (3d ed. 2007) ("[E]quity relief may include, where appropriate, the disgorgement of improperly obtained gains."); Einer Elhauge, *Disgorgement as an Antitrust Remedy*, 76 Antitrust L.J. 79, 79 (2009)

("[T]here is surprisingly little doubt that equitable antitrust remedies include requiring violators to disgorge any illegally obtained profits.").

Furthermore, the Supreme Court has repeatedly rejected the idea that equitable remedies for antitrust violations are only permissible to the extent they prevent future violations. *See, e.g.*, *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189 (1944) (although the district court ordered a remedy said to "exceed any reasonable requirement for prevention of future violations," the "Court has quite consistently recognized in this type of Sherman Act case that the government should not be confined to an injunction against further violations . . . . Those who violate the Act may not reap the benefits of their violations."). Rather, the Supreme Court has stressed that "[t]he purpose of relief in an antitrust case is so far as practicable, [to] *cure the ill effects of the illegal conduct*." *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64 (1973) (emphasis added); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 573 n.8 (1972) (relief "necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute"); *id.* at 573 ("Divestiture is a start toward restoring the pre-acquisition situation."); *see also United States v. Keyspan Corp.*, 763 F. Supp. 2d 633,

640 (S.D.N.Y. 2011) ("Disgorgement is particularly appropriate where, as here, the anticompetitive conduct in question has ceased.").

These cases confirm the District Court's authority to order disgorgement here, *even if* the remedy is only understood to address past conduct by curing and eliminating the effects of the City Defendants' RICO violations.

iii. *United States v. Carson* is No Longer Good Law

The District Court held that it was bound by this Court's determination in *United States v. Carson*, that § 1964(a) restricted equitable remedies to those designed to "'prevent and restrain' future conduct rather than to punish past conduct." 52 F.3d at 1182; JA383. But *Carson* was wrong when it was decided, and subsequent case law has repudiated each of *Carson*'s premises.

First, *Carson*'s core premise— that courts' equitable authority derives exclusively from the grants contained in § 1964(a)—has been roundly rejected. *See* 52 F.3d at 1181 ("There are no additional sources of jurisdiction" conferred by § 1964(a) beyond the power "to prevent and restrain violations of section 1962"). As this Court subsequently clarified in *SEC v. Cavanagh*, the power to order disgorgement emanates not from

a statute's provisions, but from district courts' inherent equitable authority rooted in Article III and the Judiciary Act of 1789. 445 F.3d at 117-21. The Supreme Court confirmed this principle in *Liu*, explaining that courts have "habitually awarded profits-based [disgorgement] remedies . . . well before Congress explicitly authorized that form of relief." 140 S. Ct. at 1943; *id.* (describing disgorgement as "a mainstay of equity courts").

This same authority also confirms that courts possess the inherent authority to divest ill-gotten gains acquired in the distant past. Thus, in *Cavanagh*, this Court surveyed centuries of equity practice to define the contours of the courts' disgorgement powers. Notably, many of the historical cases it cited involved purely retrospective relief. For example, in *Garth v. Cotton*, 27 Eng. Rep. 1182, 1196 (Ch. 1753), the chancery court ordered conspirators to disgorge proceeds from an unlawful timber sale that occurred 41 years before suit was filed, and years before the plaintiff was even born. *See* Tara Helfman, *Land Ownership and the Origins of Fiduciary Duty*, 41 Real Prop. Prob. & Tr. J. 651, 658-59 (2006). Similarly, in *Haldane v. Fisher*, 1 Yeates 121 (Pa. 1792), the court ordered disgorgement of rents that had been improperly collected years

earlier by a defendant who had since died. These cases confirm what *Carson* overlooked: that courts presumptively possess the power to restore ill-gotten gains even where such an order has no forward-looking effect.

Second, *Carson* overlooked *Porter* and *Mitchell* entirely, and failed to apply the correct test—namely, whether § 1964(a) restricted courts' equitable authority, either explicitly or "by a necessary and inescapable inference." *Mitchell*, 361 U.S. at 291. That failing renders *Carson* a curious anomaly in this Court's jurisprudence, which has subsequently—and repeatedly—recognized that *Porter* and *Mitchell* supply the relevant framework for determining the scope of courts' equitable powers under § 1964(a). *See United States v. Sasso*, 215 F.3d 283, 289 (2d Cir. 2000); *Chevron Corp. v. Donziger*, 833 F.3d 74, 138 (2d Cir. 2016); *see also Armstrong v. Guccione*, 470 F.3d 89, 102 (2d Cir. 2006) (applying *Mitchell* to determine availability of disgorgement under the Lanham Act); *Conboy v. AT&T Corp.*, 241 F.3d 242, 255 (2d Cir. 2001) (same for Telecommunications Act).

Third, *Carson* held that because the examples in § 1964(a) were forward-facing, any disgorgement remedy must also be geared toward

preventing future violations. 52 F.3d at 1181. That is doubly wrong. As relevant here, § 1964(a) provides that a court may issue "appropriate orders *including, but not limited to*: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person . . . . or ordering the dissolution or reorganization of any enterprise." 18 U.S.C. 1964(a) (emphasis added). While the first and third examples are directed at remedying future or ongoing violations, the second ("ordering any person to divest himself of any interest, direct or indirect") is not necessarily so limited: logic and experience dictate that a RICO violator can retain an interest in an enterprise long after the unlawful conduct has ceased.[14]

*Carson*'s interpretation of the examples fails for a second reason: the word "include" is often "used as a word of extension or enlargement," *American Sur. Co. v. Marotta*, 287 U.S. 513, 517 (1933), and this Court's post-*Carson* jurisprudence confirms that Congress intended "include" to

[14] Moreover, an order requiring the City to disgorge revenue traceable to the medallion scheme *is* arguably an order requiring divestiture of an indirect interest in an enterprise. Thus, the precise relief requested here fits squarely within one of § 1964(a)'s examples.

be given that effect here. *See Sasso*, 215 F.3d at 290 ("'the list [of examples in Section 1964(a)] is not meant to be exhaustive'") (quoting H.R. Rep. No. 91-1549); *accord Donziger*, 833 F.3d at 138 (Section 1964(a) "spell[s] out a non-exclusive list of the remedies district courts are empowered to provide in such cases"); *see also Turkette*, 452 U.S. at 585, 591-593 (explaining that examples in § 1964(a) were designed ensure that the provision was read expansively, not to narrow its reach); *Sedima*, 473 U.S. at 491 n.10 (noting Congress's commanded that § 1964 "be liberally construed to effectuate its remedial purposes").

Fourth, *Carson* holding that § 1964(a)'s "prevent and restrain" language restricts courts' ability to craft backward-looking disgorgement remedies contravenes binding Supreme Court precedent and post-*Carson* jurisprudence. As numerous cases have confirmed since *Carson*, *Porter* and *Mitchell* squarely rejected the notion that such language limits courts to forward-facing disgorgement remedies. *See, e.g.*, *Rx Depot, Inc.*, 438 F.3d at 1058; *Lane Labs-USA, Inc.*, 427 F.3d at 235; *cf. AMG*, 593 U.S. at 79 (statute's sole reference to "permanent injunctions" not independently sufficient to establish Congress's intent to limit courts' power to craft disgorgement remedies). Moreover, *Porter* was explicit that

disgorgement could be justified on the grounds that it deterred future misconduct *and* on the grounds that "restoring the status quo" by returning "illegal gains" to victims is an essential part of equity. 328 U.S. at 402. As this Court recognized in *Bronson Partners, LLC*, 654 F.3d 359, 366 (2d Cir. 2011), these are "independent" justifications. Nothing in the RICO statute demonstrates the "clear and unmistakable intent" required to strip courts of their inherent authority to restore the status quo in the manner requested here.

For similar reasons, this Court need not—indeed, cannot—follow *Carson*'s dicta that "[o]rdinarily, the disgorgement of gains ill-gotten long in the past will not serve the goal of 'preventing and restraining' future violations unless there is a finding that the gains are being used to fund or promote the illegal conduct, or constitute capital available for that purpose." 52 F.3d at 1182. Both *Porter* and *Mitchell* confirmed that disgorgement is permissible under "restrain and prevent" statutes without such a finding. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 655 (2d Cir. 2019) (dicta that conflicts with the Supreme Court precedent must be disregarded); *accord Preterm-Cleveland v. McCloud*, 994 F.3d 512, 565 (6th Cir. 2021).

Finally, *Carson* rejected the argument that backward-looking disgorgement remedies could be justified on deterrence grounds, reasoning that if Congress had so intended, "the phrase 'prevent and restrain' would read 'prevent, restrain and discourage,' and would allow any remedy that inflicts pain." 52 F.3d at 1182. That reasoning is directly contrary to *Porter*, which recognized that disgorgement prevents future violations by rendering them unprofitable. 328 U.S. at 400 ("Future compliance may be more definitely assured if one is compelled to restore one's illegal gains."); *see also Philip Morris USA*, 396 F.3d at 1223 (Tatel., J., dissenting) ("If restitution helps enforce compliance, then we should have little doubt that disgorgement helps prevent and restrain [RICO] violations."). It is also contrary to this Court's case law which, since *Carson*, has repeatedly recognized that the pain inflicted by disgorgement prevents future violations. *Cavanagh*, 445 F.3d at 117 (By "prevent[ing] wrongdoers from unjustly enriching themselves through violations," disgorgement has the forward-looking "effect of deterring subsequent fraud."); *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 213 (2d Cir. 2019) ("disgorgement of profits is the only way the courts can fashion a strong enough deterrent" to prevent "companies from willfully

infringing a competitor's mark"); *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) ("The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains."). As these cases confirm, remedies that "discourage" also have the effect of "preventing and restraining" future violations. Thus, rather than enhancing courts' equitable authority, as *Carson* suggested, the inclusion of "discourage" in § 1964(a) would have simply added redundancy.

For these reasons, this Court should decline to follow *Carson*'s requirement that disgorgement remedies be limited to preventing future violations.[15]

[15] *Carson* was also internally inconsistent. On the one hand, it expressed skepticism that forcing the disgorgement order could be justified on deterrence grounds because the defendant had long-ago retired from the union position that he had used to commit the predicate offenses 52 F.3d at 1182-83. On the other, it upheld the injunction barring him from resuming his union activities because there was "a 'reasonable likelihood' that, absent an injunction, Carson would attempt to return to a position in which he could engage in racketeering." *Id.* at 1184.

### B. The District Court's Finding That a Disgorgement Order Could Not "Prevent or Restrain" Future Violations By City Defendants Was In Error

Even under *Carson*'s limiting framework, the disgorgement remedy sought here is within the court's powers under § 1964(a). Requiring City Defendants to divest themselves of their ill-gotten gains can readily be justified on the grounds that it would prevent future violations by eliminating the financial incentive to manipulate taxable sales to generate revenue.

In that respect, this case is wholly distinguishable from *Carson*. There, the defendant had been "removed from his union position five years before the disgorgement was ordered, and had long been removed from any involvement in the activities on which his conviction was based." *U.S. v. Priv. Sanitation Indus. Assn. of Nassau/Suffolk, Inc.*, 914 F. Supp. 895, 901 (E.D.N.Y. 1996), *aff'd sub nom. Carson*. Thus, this Court explained that it could "not see how it serve[d] any civil RICO purpose to order disgorgement of gains ill-gotten long ago by a retiree." *Carson*, 52 F.3d at 1182.

The same cannot be said for the City Defendants. These entities are fully operational and have the opportunity, means, and temptation to

implement similar schemes. While the City has not held a medallion auction since 2014, the TLC remains deeply embedded in every aspect of the sale, transfer, inheritance, refinancing, and potential re-issuance of taxi medallions, *see* 35 RCNY Chapter 58, and the laws permitting TLC to hold medallion auctions remain in force. 35 RCNY Chapter 65. TLC also charges a 0.5% transfer tax on each medallion transfer, which gives City Defendants an incentive to inflate the prices to increase revenue, NYC Local Law No. 58 of 2017; and TLC continues to publish "Medallion Transfer Reports" listing the value of every medallion sale, thus furnishing it with the opportunity to manipulate the market prices.[16] Moreover, there is no question that, unlike in *Carson*, the profits from the medallion scheme "constitute capital available" to the City to commit future RICO violations. 52 F.3d at 1182.

At a minimum, the District Court should have allowed discovery, as *Carson* ultimately required, to determine the extent to which the City retains the motive, means, and capacity to commit similar RICO violations. *See Carson*, 52 F.3d at 1182 (remanding for additional fact development on that question). Had discovery been permitted, Plaintiffs

[16] *See* NYC TLC, "Medallion Transfers," https://perma.cc/5ERZ-62ML.

would have adduced evidence that the City and its agencies routinely use tax lien sales[17] and various public auctions to generate revenue,[18] and that City Defendants could readily replicate a fraudulent scheme, similar to the one challenged here, in these settings.[19]

Thus, even if the Court finds that *Carson* is still good law, it should reverse the order below and permit Plaintiffs to build a record on the question of whether disgorgement can be justified by a forward-looking rationale.

* * *

A disgorgement remedy would be all the more essential—and *Carson* even more inapposite—were this Court to uphold the finding that municipalities are immune from treble damages. As *Mitchell* explained,

---

[17] *See, e.g.*, NYC Dep't of Finance, "Department of Finance Extends Deadline for 2025 Tax Lien Sale," https://perma.cc/Z7HY-F2YW.

[18] Preliminary Mayor's Management Report (PMMR) for Fiscal Year 2025, Department of Citywide Administrative Services, "Our Goals and Services," at 6, https://perma.cc/8G6H-8BK5; *see* JA 467.

[19] The Court may take judicial notice of this information because it posted on official City websites. *See Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 549 (2d Cir. 2002) (court can take judicial notice of information on City website); *see also Gee v. Doe*, 2022 U.S. Dist. LEXIS 6938, at *2 n.2 (S.D.N.Y. Jan. 13, 2022) (taking judicial notice of the New York City Department of Correction's policies available on government website).

disgorgement is rooted in the equitable concept that courts must be permitted to "provide complete relief" for statutory violations. 361 U.S. at 289, 292. *Carson* implicitly answered this concern by observing that the party seeking disgorgement (the United States) was not the immediate victim of Carson's conduct and that "[i]f the parties from whom Carson wrongfully took money wished to recover it, they could have pressed their own claims." 52 F.3d at 1182. That option does not exist in a world where the wrongdoer is a municipal entity and municipal entities enjoy immunity from § 1964(c) claims.

If upheld, then, the combined effect of the District Court's orders would be to deprive Plaintiffs of any remedy and to fully immunize the City Defendants from the consequences of their criminal actions. Such a result would be wholly antithetical to RICO's broad remedial goals.

## III. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ARE TIMELY

The March 31, 2023 order dismissed the RICO claims as untimely because Plaintiffs were on inquiry notice more than five years before filing suit and deemed the unjust enrichment claim waived because Plaintiffs failed to defend its timeliness in opposition briefing. On reconsideration, however, the court reinstated the RICO claims, holding

that *American Pipe* tolling rendered them timely. Because this tolling analysis applies equally to the unjust enrichment claim, this Court should exercise its discretion to reverse its dismissal as well.[20]

While this Court generally declines to consider claims first raised on appeal, that rule "is prudential, not jurisdictional." *Sniado v. Bank of Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004). This Court routinely exercises its discretion to consider new or waived contentions "where the argument presents a question of law and there is no need for additional fact-finding." *Fabrikant v. French,* 691 F.3d 193, 212 (2d Cir. 2012); *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 109 (2d Cir. 2019) (allowing appellant to contest legal point it had conceded below); *Shukla v. Sharma*, 586 F. App'x 752, 754 (2d Cir. 2014) (considering new argument on appeal despite lack of explanation for why it wasn't raised below, because the court could "discern without great difficulty" that the new argument was

[20] The March 23, 2023 order's waiver finding was in error. Defendants argued that all claims were barred due to early inquiry notice and Plaintiffs' opposition devoted 14 pages to the argument that inquiry notice was absent. JA389-409, 411-15. Plaintiffs also answered Defendants' arguments that the complaint failed to state an unjust enrichment claim. *Id.* JA417-20. Plaintiffs, however, concede a technical waiver insofar as they failed to specify in their motion for reconsideration that *American Pipe* tolling saved the unjust enrichment claim as well.

correct as a matter of law). The equities strongly favor considering Plaintiffs' argument that *American Pipe* tolling preserves the unjust enrichment claim.

The availability of *American Pipe* tolling "is a pure question of law." *Collins v. Vill. of Palatine*, 875 F.3d 839, 842 (7th Cir. 2017); *see also Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 62 (2d Cir. 2019) (vacating judgment based on tolling contention that appellant presented for first time on appeal). Nor is there any question that *American Pipe* tolling renders the unjust enrichment claims timely. The District Court has already found that the 2017 *Singh* action—which challenged the City's "artificial inflation of medallion prices in advance of the 2013-2014 auctions"—tolled the RICO claims until December 2020, placing them comfortably within the four-year limitations period. JA361.

This reasoning applies even more forcefully to the unjust enrichment claim. That claim rests on identical conduct alleged in *Singh* and effectively mirrors the *Singh* plaintiffs' rescission claim. JA447-48; *Restatement (Third) of Restitution and Unjust Enrichment* § 54, cmt. b (2011) ("A perfect rescission would restore both parties to the status quo ante by specific restitution of property previously transferred, leaving no

unjust enrichment"). City Defendants thus had notice of both the factual predicate and their potential obligation to divest the profits of the scheme. Moreover, unjust enrichment claims enjoy a six-year limitations period, *see Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 364 (2d Cir. 2013), compared to RICO's four-year period. *See Malley-Duff & Assocs.*, 483 U.S. at 156. *A fortiori,* any tolling sufficient for the RICO claims necessarily preserves the unjust enrichment claim as well.

Finally, the timeliness of the unjust enrichment claims was effectively litigated below. *American Pipe*'s application to the RICO and unjust enrichment claims turned on the same two inquires: the duration of the tolling period and the similarity of the underlying factual allegations. Because the parties thoroughly briefed both issues for the RICO claims, JA451-61, they necessarily addressed every question material to the unjust enrichment claim's timeliness. *See Goldberg v. Pace Univ.*, 88 F.4th 204, 214 n.10 (2d Cir. 2023) (permitting consideration of new argument on appeal where it "presents a legal question, requires no additional factfinding[,] and [the opposing party] has had an adequate opportunity to respond").

Accordingly, this Court should exercise its discretion and reverse the order dismissing the unjust enrichment claim on untimeliness grounds.

## CONCLUSION

For the foregoing reasons, the Court should reverse the orders below to the extent they found (1) that the City Defendants are immune from treble damages; (2) that § 1964(a) forecloses a disgorgement remedy; and (3) that Plaintiffs' unjust enrichment claims are untimely.

Dated: July 14, 2025
New York, NY

/S/ Joseph Pace
J. PACE LAW, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
(917) 336-3948
jpace@jpacelaw.com

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Second Circuit Rules 32.1(a)(4), because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,740 words, as determined by the wordcount function of Microsoft Word.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/S/ Joseph Pace

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2025, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished on them via the appellate CM/ECF system.

/S/ Joseph Pace

# **ADDENDUM**

18 U.S.C. § 1964 – Civil Remedies

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in; and ordering the dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may, at any time, enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

(d) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations

of the criminal offense in any subsequent civil proceeding brought by the United States.